**UNITED STATES of America**

v.

**Donald Ray SCOTT.**

**No. 1:99–CR–040.**

United States District Court,
E.D. Tennessee,
at Chattanooga.

Sept. 8, 1999.

Carl Kirkpatrick, United States Attorney, Perry H. Piper, Assistant United States Attorney, Chattanooga, TN, for Plaintiff.

Howard L. Upchurch, Pikeville, TN, for Defendant.

## *MEMORANDUM*

EDGAR, Chief District J.

Defendant Scott has moved to suppress the government's use of certain evidence seized from real property or buildings located near his residence, evidence seized from his residence, and statements made by defendant while in police custody. (Court File No. 9). This Court held an evidentiary hearing and heard oral arguments by counsel on August 16, 1999. After considering the record and the applicable law, this Court concludes that the motion to suppress evidence and oral statements will be **GRANTED IN PART, AND DENIED IN PART.**

## I. *Facts*

On April 7, 1999, Sequatchie County, Tennessee Sheriff's Department Investigator Jackie Shell ("Shell") had acquired information from a reliable informant that the informant had seen approximately 100 marijuana plants in pots with lights over them. These plants were, according to the informant, in an outbuilding on property owned by defendant Donald Ray Scott ("Scott"). The informant had been known to Shell for over 10 years and had provided reliable information in the past. The informant had seen the marijuana plants within the last 72 hours. Investigator Shell went to the location of the outbuilding, hoping to find Scott there and obtain a consent to search. Shell and Scott had known each other for many years. Scott was not there.

When he was unable to locate Scott, Shell decided to seek a search warrant for the outbuilding. At approximately 2:00 to 3:00 o'clock P.M. he called General Sessions Judge L. Thomas Austin to check on his availability. Judge Austin advised that

he would be at his home or at his nearby barn later in the afternoon. Shell put his information in an affidavit and called Austin, but was unable to contact Austin by phone, although Austin was at or around his home some three or four miles outside of Dunlap, Tennessee, the county seat. Shell then sought out Hollis Barker, a retired General Sessions Judge.

Sequatchie County, sparsely populated and rural, is authorized by state law to have only one part time General Sessions Judge.[1] In April 1999 that judge was Judge Austin. Austin had served since January 1998, replacing Hollis Barker, who had just retired. As a law enforcement officer Shell had frequently been present in General Sessions Court. Since retiring, "Judge" Barker had served as "Special Judge" on some occasions when Judge Austin was absent; and, prior to April 7, 1999, Shell had obtained three search warrants from Barker. Barker signed this warrant at 6:00 P.M.

On the evening of April 7th, Shell and other officers executed the warrant, and found marijuana plants in the outbuilding as well as other evidence of marijuana propagation. When Scott appeared on the scene, Shell arrested him and took him to the Sequatchie County jail. Sometime after reaching the jail Scott was Mirandized.[2] Scott spent the night in jail. The next morning a deputy Lockhart brought Scott to an office in the jail and requested that Scott consent to search his residence, which is a log house near the outbuilding that the officers had searched the night before. Scott refused, and was returned to his cell. Later, Shell also asked Scott for consent. Scott agreed to allow a search of another location, but not his log house residence. Shell told Scott that it would be better for him if he signed the consent; otherwise the law enforcement

---

1. General Sessions Court had jurisdiction to handle small claims and criminal misdemeanors, as well a certain preliminary matters in criminal felony cases. TENN. CODE ANN. §§ 16–15–201, 40–1–109 (1994). It is not a court of

record. *State v. McClintock,* 732 S.W.2d 268, 270 (Tenn.1987).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

officers would go to his residence, kick his door down, and search anyway. Finally, at 12:24 P.M. Scott, on the third or fourth request, signed a written consent to search his residence. At this time he was still in jail, and had not been granted a bond hearing. He was finally granted an appearance bond later in the afternoon of August 8th. Shell and other officers proceeded to Scott's residence where they kicked the door down anyway and found numerous firearms and a few harvested marijuana plants.

## II. The Search Warrant

### A. Issuance by a Magistrate

■ Scott first argues that the search warrant was not issued by a "magistrate," or an official authorized to issue warrants, and thus is void. The validity of a search warrant obtained by state officers turns only on constitutional issues, even if the fruits of the search are ultimately used in federal prosecution. *United States v. Bennett,* 170 F.3d 632, 635 (6th Cir.1999); *United States v. Shields,* 978 F.2d 943, 946 (6th Cir.1992). This Court must look to Tennessee criminal procedure requirements and federal constitutional law to test the search warrant in this case. *Bennett,* 170 F.3d at 636. Scott contends that former General Sessions Judge Barker is not qualified to issue a warrant under Tennessee law.

Only a "magistrate" may issue a search warrant to a state officer in Tennessee. TENN. CODE ANN. § 40–5–101 (1994). Tennessee statutory law provides a list of individuals who constitute magistrates for purposes of issuing warrants. Those persons include

(1) The judges of the supreme court;

(2) The judges of the circuit and criminal courts;

(3) Judicial commissioners;

(4) Judges of the courts of general sessions;

(5) City judges in cities and towns; and

(6) Judges of juvenile courts.

TENN. CODE ANN. § 40–5–102. Retired general sessions judges are not included on this list.

■ The government argues that Judge Barker was a special general sessions judge recently designated by General Sessions Judge Austin. Indeed, special general sessions judges do have authority to issue search warrants. *State v. Smith,* 867 S.W.2d 343, 349 (Tenn.Crim.App.1993). However, the authority of special judges attaches only when the general sessions judge is unavailable, *see* TENN. CODE ANN. § 16–15–209 (special judges may be appointed when general sessions judge cannot attend court), and expires after that time. In this case, Judge Austin was available to issue the search warrant, and state officers had actually contacted him to do so. Thus, any authority Judge Barker held had terminated.

■ Moreover, Scott correctly points out that Judge Barker's special appointment was invalid because it failed to comply with Tennessee statutory procedures for appointing a special general sessions judge. When a county's sole general sessions judge must be absent from court, he or she may choose a former or retired judge to sit as a special judge. However, the special judge may only serve by designation of the chief justice of the state supreme court. TENN. CODE ANN. § 16–15–209 (Supp.1999). In this case, Judge Barker was not designated as a special judge by the chief justice of the Tennessee Supreme Court. Therefore, his appointment failed to comply with Tennessee law. *See Steadman v. State,* 217 Tenn. 598, 399 S.W.2d 756, 757 (1966) (rejecting validity of special general sessions judge's actions where appointment did not follow statutory procedure). Consequently, he did not qualify as a special general sessions judge at the time he issued the warrant to Investigator Shell.

■ The government next argues that Judge Barker was a de facto judge, and thus could issue a valid search warrant. Tennessee has long recognized the doctrine of de facto judges. *Bankston v.*

*State,* 908 S.W.2d 194, 196 (Tenn.1995). The United States Supreme Court has even ratified the doctrine in other contexts. *Glidden Co. v. United States,* 370 U.S. 530, 535, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). However, this Court finds that Judge Barker does not fall within Tennessee's definition of de facto judge.

■■■ Under Tennessee law, a de facto judge is "one acting with color of right and who is regarded as, and has the reputation of, exercising the judicial function he assumes." ·*State v. Biggers,* 911 S.W.2d 715, 718 (Tenn.1995). Neither a mere claim to be a judge nor assumption of judicial duties renders one a de facto judge. *Tennessee Gas Transmission Co. v. Vineyard,* 191 Tenn. 331, 232 S.W.2d 403, 404 (1950). Thus neither Judge Barker's issuance of a search warrant nor his implied claim of authority to do so characterizes him as a de facto judge.

■■■ Additionally, Judge Barker's designation as a special general sessions judge by Judge Austin did not clothe him with de facto judge status.[3] As a general rule, "where an officer under color of right continues in the exercise of his duties ... after his authority to act has ceased, he is an officer de facto". *Ridout v. State,* 161 Tenn. 248, 30 S.W.2d 255, 258 (1930). Such "holdover" officers, claiming authorized positions, can issue valid search warrants. *State v. Bexley,* 1988 WL 10048 (Tenn.Crim.App.) (holding that judicial commissioner remaining active after term expired could issue valid search warrant).

However, the Tennessee Supreme Court has recognized a common exception to this rule for situations in which the holdover judge's successor has taken possession of the office. *Ridout,* 30 S.W.2d at 258. Where a general sessions judge resumes his judicial activities, his special general sessions judge replacement loses claim to de facto status. *See id.* (holding that if regular judge had resumed bench, special judge would not be valid holdover). Because Judge Austin was fully performing his judicial duties, the government cannot claim that Judge Barker's purported holdover as special general sessions judge rendered him a de facto judge. Consequently, the search warrant he issued is invalid.

### B. Leon Good Faith Exception

The government contends that the evidence seized pursuant to the search warrant in this case should not be excluded, even if Judge Barker was not authorized to issue the warrant, because Officer Shell executed the warrant in good faith. Interestingly, no federal court has addressed the issue of whether the good faith exception to the Fourth Amendment's exclusionary rule applies when a search warrant is technically deficient due to issuance by an unqualified individual.[4] Thus, this Court is presented with a novel issue of federal constitutional law. After careful consideration, this Court concludes that the exclusionary rule does not apply to evidence seized by Investigator Shell in good faith reliance on the search warrant that was issued by retired Judge Barker.[5]

---

3. This is true, even assuming that Judge Austin's designation of Judge Barker as a special general sessions judge complied with the requirements of TENN. CODE ANN. § 16–15–209.

4. Additionally, only one state court has addressed this issue. The Supreme Court of Rhode Island found that "*Leon's* good faith rule ... would be inapplicable .. [where a search warrant was not] ...signed by a magistrate with either de jure or· de facto authority." *State v. Nunez,* 634 A.2d 1167, 1171 (R.I.1993). However, Rhode Island law at the time did not recognize a good faith exception to the exclusionary rule, *id.,* so the court

had no precedent to rely upon in drawing its conclusion. Furthermore, the court did not analyze or reference either *Leon* or any secondary authority on the subject. For these reasons, and for those which appear in the remainder of this opinion, this Court finds the Rhode Island opinion unpersuasive.

5. In his discussion of *Leon's* good faith exception, commentator Wayne R. Lafave explains that the Supreme Court "seems to have concluded that a warrant may not be invalidated merely because it was issued by a person not constitutionally authorized to do so, [or] by a person who knew he was disqualified either generally or in the particular case ..." 1

■ The Fourth Amendment, by its terms, does not preclude the use of evidence obtained in unreasonable searches and seizures. The exclusionary rule, which prohibits the use of such evidence, is a judicial remedy created to deter officers from violating the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). As with any judicially created doctrine, the exclusionary rule is subject to judicial modification. In *United States v. Leon*, the Supreme Court adopted what is now a well-established exception to the exclusionary rule. When an officer acts with objective good faith, in reliance on a search warrant obtained from a judge or magistrate, and the officer acts within the warrant's scope, the exclusionary rule does not bar the prosecution from using evidence seized pursuant to the warrant in its case-in-chief. *Id.* at 920, 104 S.Ct. 3405.

The Supreme Court's analysis in adopting the good faith exception to the exclusionary rule applies equally to the factual situation now before this Court. In *Leon*, the Supreme Court carefully balanced the costs and benefits of excluding evidence obtained in violation of the Fourth Amendment. *Id.* at 907, 104 S.Ct. 3405. On one hand, the exclusionary rule provides the most effective method of deterring government violations of the Fourth Amendment. *Id.* at 906, 104 S.Ct. 3405. On the other hand, strict application of the exclusionary rule impedes the truth-finding function of our legal system. As a consequence of this impediment, some guilty defendants may go free or obtain reduced sentences through plea bargaining. *Id.* In turn, "indiscriminate application of the exclusionary rule . . . may well 'generate disrespect for the law and administration of justice.'" *Id.* at 908 (quoting *Stone v. Powell*, 428 U.S. 465, 491, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). These concerns suggest that some hesitance to strictly apply the exclusionary rule is inappropriate.

After weighing these burdens and benefits, the Supreme Court focused on the deterrent effect of the exclusionary rule when officers act in good faith. Usually, when an officer, in objective good faith, obtains a search warrant and acts within its scope, no police misconduct exists that must be deterred. *Leon*, 468 U.S. at 921, 104 S.Ct. 3405. In such a case, the goal of deterring the police from conducting unreasonable searches cannot be furthered by application of the exclusionary rule. Yet the costs of applying the rule remain intact. From this balancing of costs and benefits, the Supreme Court fashioned the *Leon* good faith exception to the exclusionary rule.

The exclusionary rule's purpose of deterring police misconduct is similarly not furthered where a police officer relies in good faith upon a search warrant executed by someone he reasonably believes to be a magistrate, even when that person is later determined to be unqualified to issue a warrant. In such a case, the officer has engaged in no misconduct capable of deterrence by application of the exclusionary rule. However, exclusion of the evidence obtained pursuant to such a warrant still bears the significant costs of hindering the judicial system's truth-finding function, allowing guilty defendants to go free, and lessening the public's confidence in the legal system. This balancing of costs and benefits supports application of the good faith exception to the fact situation raised in this case.

■ The facts of the case at bar support a finding that the good faith exception should apply. Officer Shell prepared an affidavit and obtained a search warrant from Judge Barker with a reasonable belief in his qualification to issue the document. He then executed the warrant within the scope of the permissible activity. These actions do not constitute police

WAYNE R. LAFAVE, SEARCH AND SEIZURE § 1.3(f), at 72 (3d ed.1996). Thus, the necessity of determining who constitutes a neutral and detached magistrate is largely obviated by the

*Leon* good faith requirement and is no longer determinative on the issue of suppression. 2 LAFAVE, *supra*, § 4.2(a), at 439.

misconduct. Consequently, suppressing the evidence obtained in this search will not deter any violation of the Fourth Amendment. However, applying the exclusionary rule will hamper the truth-finding mission of our criminal judicial system.

Although Judge Barker was not a "magistrate" under Tennessee law, the record does not indicate that he was anything but neutral and detached as required by *Leon*, 468 U.S. at 914, 923, 104 S.Ct. 3405. In fact, Scott has raised no such allegation. The Supreme Court prefers the use of search warrants simply because these documents provide the "detached scrutiny of a neutral magistrate" and prevent officers with vested interests in conducting searches from making probable cause determinations. *Leon*, 468 U.S. at 913–14, 104 S.Ct. 3405. Judge Barker's neutral and detached determination of probable cause serves this purpose, as he had no interest in the search of Scott's property, and he served as an intermediary between Officer Shell and the finding of probable cause.

■ Application of the *Leon* good faith exception to the factual situation presented in this case does not mean that an officer can execute a search warrant issued by any member of the general public. The good faith exception to the exclusionary rule applies only when an officer reasonably believes that the warrant was properly issued. *Leon*, 468 U.S. at 922–23, 104 S.Ct. 3405. Absent such a reasonable, belief, the good faith exception does not apply, and the seized evidence is suppressed under the exclusionary rule.

In this case, it was reasonable for Shell to believe that the search warrant was validly issued by Judge Barker. Judge Barker had served as the General Sessions Judge in Sequatchie County prior to Judge Austin. Since Judge Austin's appointment, and in his absence, Judge Barker had served as "Special Judge" on several occasions. Even after Judge Austin took the bench, Judge Barker issued search warrants for Officer Shell on three occasions.

■ Moreover, Judge Barker, who was in the best position to know the law, never informed Shell that he was unqualified to issue search warrants. An officer is not required to disbelieve a judge who advises him, by word or action, that the issued warrant is valid. *Massachusetts v. Sheppard*, 468 U.S. 981, 989–90, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). The exclusionary rule serves to deter police misconduct, not to punish the errors of magistrates and judges. *Id.* at 990, 104 S.Ct. 3424; *Leon*, 468 U.S. at 916, 104 S.Ct. 3405. Under these circumstances, it was reasonable for Shell to believe in the validity of the warrant issued by Judge Barker.

In sum, this Court finds that the *Leon* good faith exception can be applied to cases in which an officer reasonably executes a search warrant later determined to be technically deficient because it was issued by an unqualified party. In this case, Officer Shell reasonably relied on the search warrant executed by Judge Barker.[6] Therefore, the exclusionary rule will not bar the prosecution's use of the evidence seized pursuant to the warrant.

### C. Particularity of Description

■ Scott next contends the search warrant failed to describe the premises to be searched with sufficient particularity. Suppression remains the appropriate remedy if a warrant is so "facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized— that the executing officers could not reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405 (1984). A description in a search warrant need not be technically accurate in every detail. Rather, the description must

---

**6.** Scott also seeks to suppress statements he made while in custody, following the execution of the search warrant and his arrest. Because use of the warrant was made in good faith, Scott's arrest was not unlawful. Consequently, the statements he made in custody, after being Mirandized, also need not be excluded.

enable the executing officer to locate and identify the premises while eliminating any reasonable probability that another location may be searched by mistake. *United States v. Durk,* 149 F.3d 464, 465 (6th Cir.1998). The particularity requirement provides a reason for the search and a limitation to the scope of the searchable area. *Id.*

■ The search warrant in this case sufficiently described the property to be searched. On its face, the warrant permitted a search of "the said person of the defendant and of the residence and any and all outbuildings and the vehicles on the premises," as described in the attached exhibit "A." Verbatim, exhibit "A" gave the following directions:

> Beginning at the traffic light at the intersection Hwy 127 and Hwy 28 travel south on Hwy 127 for approximately twelve and eight tenths (12.8) miles to the intersection of Hwy 127 and Swanger Road. Turn right onto Swanger Road and travel for three tenths (.3) of a mile to the intersection of Swanger Road and Scott Road. Turn right onto Scott Road and travel eight tenths (.8) of a mile to the end of the road. At the end of this road turn to the driveway on the right. This driveway is the entrance to the premises. This being the premises under the control of the defendant, Donald Scott, the premises to be searched.

(Court File No. 9). From these directions, which included a clear starting point, street names, and specific mileage to travel, an officer could locate the premises with reasonable effort. Furthermore, although Scott protests the warrant's failure to specifically describe the acreage and buildings on the property, he has not alleged that an officer, following these directions with reasonable effort, could mistakenly arrive at any other premises. Therefore, this Court finds that the search warrant's description of the premises was sufficiently particular.

### D. Probable Cause

Scott's next assertion is that Shell's affidavit, which was presented to Judge Barker for issuance of the search warrant, failed to establish probable cause. Specifically, he contends that Shell failed to provide a factual basis for concluding that the informant's testimony was reliable. Scott is mistaken.

■ This Court looks to all of the statements contained in Shell's affidavit to determine whether probable cause exists. In adjudicating whether probable cause exists, this Court must look at the "totality of the circumstances" defined in the affidavit. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under this test, the reliability of the informant is one factor to consider, but analysis of reliability is not dispositive on the matter of probable cause. *Id.* at 230, 103 S.Ct. 2317; *United States v. Smith,* 182 F.3d 473, 477–78 (6th Cir.). Because informants' tips may vary in value and reliability, rigid rules cannot apply to every situation. *Gates,* 462 U.S. at 232, 103 S.Ct. 2317. Probable cause must be determined by looking to the whole of the affidavit.

■ Shell's affidavit contained sufficient facts for Judge Barker to find probable cause to search Scott's property. The attestations contained therein provide information from which the informant's reliability could be established. Shell averred that he had known the confidential informant for ten years. He certified that the informant was known to be reliable and had provided reliable information in the past. These facts establish the reliability of the confidential informant.

■ Although Shell does not raise any issues with respect to other factors that play a role in a probable cause determination, it is appropriate for this Court to evaluate them under the totality of the circumstances test. Both the basis of the informant's knowledge and corroborative evidence provided by the government are additional factors to consider. *United States v. Shamaeizadeh,* 80 F.3d 1131, 1136 (6th Cir.1996). In this case, the informant's knowledge was based

upon recent, personal observation, and he provided elaborate detail of what illegal paraphernalia could be found on the property. Further, Shell presented corroborative evidence regarding the defendant's ownership of the property to be searched.[7] From all of these circumstances, probable cause was rightly found.[8]

### III. Consent to Search

■ Scott also protests the use of evidence seized when state officers searched his residence on August 8, 1999, pursuant to a consent form he signed. Scott asserts that he did not consent voluntarily. A defendant's consent to search eliminates an officer's need to establish probable cause and obtain a search warrant. However, when the government chooses to rely upon such consent, it bears the burden of proving that the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government must demonstrate that consent was uncontaminated by any duress or coercion. *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir.1998). In this case, the government has not sustained its burden of proof on this issue.

■ The facts of this case suggest that Scott's consent was not voluntary. In order to determine whether an individual freely and voluntarily consented to a search, this Court must evaluate the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041; *Erwin*, 155 F.3d at 823. The length and nature of an individual's retention by police and the use of coercive or punishing conduct by the police must be considered. *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.1996). Relevant police conduct includes subtler forms of coercion that may influence an individual held in custody. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir.1998). Such coercion existed in the case at bar.

■ First, the duration of Scott's detention before he gave consent suggests the possibility of duress. Although Scott was taken to jail on the evening of August 7, 1999, he did not consent to the search of his home until the early afternoon of the following day. During this time, officers requested Scott's consent three or four times, and Scott refused all initial requests. Additionally, throughout this period of time, Scott was not granted a bond hearing, although he asked officers when bond would be posted. Yet a hearing was granted on the afternoon of August 8, 1999, after Scott signed the consent form.

Even more disturbing is the fact that Shell informed Scott that if he did not sign the consent document, the law enforcement officers would go to his residence, kick his door down, and search anyway. This statement implied that the officers had authority to search his house, regardless of whether Scott gave his consent. Moreover, the statement conveyed the idea

7. Corroborative evidence may not have been necessary in this case. Whether an informant provided reliable information in the past is a key consideration under the totality of the circumstances test. *Smith*, 182 F.3d 473, 477–78. When the informant is a person of proven reliability, his hearsay statements may be found reliable without any corroborating evidence. *Id.* at 479.

8. Recent precedent from the Sixth Circuit is unclear as to how the *Leon* good faith exception should be applied to probable cause determinations. *See United States v. Allen*, 168 F.3d 293, *vacated and rehearing en banc granted*, 179 F.3d 1002 (6th Cir.1999). In *Leon*, the Supreme Court carved out an exception to application of the good faith doctrine for situations in which a warrant is based upon an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. at 923. However, this Court need not address the issues of whether *Leon* applies to this situation and whether Shell acted in good faith reliance on the search warrant, as sufficient indicia of probable cause exists in Shell's affidavit for the search warrant to be issued.

that the officers could, and would, use force to enter Scott's home if he did not provide them with consent to enter. *Accord United States v. Kampbell,* 574 F.2d 962, 963 (8th Cir.1978) (finding officer's statement that he wouldn't ransack defendant's house if consent was given to imply right and intention to ransack). Under these circumstances, Scott faced some amount of duress. The government has failed to prove that his consent was voluntary. Consequently, evidence seized at Scott's home must be suppressed.

### IV. Conclusion

For the foregoing reasons, Scott's motion to suppress will be **GRANTED IN PART and DENIED IN PART.**