UNITED STATES of America,
Plaintiff–Appellee,

v.

James ERWIN, Jr., Defendant–Appellant.

No. 94–1766.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1997.

Decided Sept. 17, 1998.

Kenneth M. Mogill (argued and briefed), Mogill, Posner & Cohen, Detroit, MI, for Appellant.

Christopher P. Yates (argued and briefed), Office of the U.S. Attorney, Grand Rapids, MI, for Appellee.

Before: MARTIN, Chief Judge; MERRITT, KENNEDY, JONES, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which MERRITT, KENNEDY, NELSON, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, and DAUGHTREY, JJ., joined. MARTIN, C.J. (pp. 825–828), delivered a separate dissenting opinion, in which JONES, MOORE, and COLE, JJ., joined.

## OPINION

RYAN, Circuit Judge.

We granted *en banc* review in this case, primarily to decide two questions about the warrantless search of the defendant's motor vehicle.

They are:

- Whether, once two law enforcement officers' suspicion that defendant James Erwin, Jr. was driving while intoxicated proved to be unwarranted, they were required to permit him to depart without further questioning, even if they then had a reasonable and articulable suspicion of other criminal conduct.
- If the answer is no, whether, in this case, the defendant's consent to search the vehicle was voluntary.

Our answers to these questions will, of necessity, determine the ultimate issue: whether the search of Erwin's vehicle was reasonable under the Fourth Amendment.

There is a second issue in this case, although it is not one for which we granted *en banc* consideration: whether the district court erred, to the defendant's unfair prejudice, in refusing to direct that the case be heard in the Southern Division, rather than the Northern Division, of the United States District Court for the Eastern District of Michigan.

## I.

When we granted the government's petition for *en banc* review, we vacated the judgment of the panel of this court that held, in a divided opinion, that the district court erred in denying the defendant's motion to suppress the fruits of the search of his vehicle because, "[a]fter the traffic matter was concluded in the instant case, the defendant-appellant should have been released." *United States v. Erwin,* 71 F.3d 218, 222 (6th Cir.1995), *vacated,* 78 F.3d 232 (6th Cir.1996).

We now hold that the warrantless search of the defendant's vehicle was not unconstitutional under the Fourth Amendment because (1) the Constitution does not mandate that a driver, after being lawfully detained, must be released and sent on his way without further questioning once the law enforcement officer determines that the driver has not, in fact, engaged in the particular criminal conduct for which he was temporarily detained; and (2) the district court's determination—that the defendant's consent to search his vehicle was voluntary—is not clearly erroneous. We also hold that the district court did not err in refusing to order the intradistrict assignment requested by the defendant.

## II.

In conducting the warrantless search that is the primary focus of this opinion, the arresting deputy sheriffs discovered one kilogram of cocaine in the defendant's car. Subsequently, the defendant entered a conditional guilty plea to an indictment charging him with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The plea was conditional because Erwin wished to preserve for review the district court's denial of his earlier motions to suppress the cocaine and to "correct an improper assignment" of his case to the Northern Division of the United States District Court for the Eastern District of Michigan.

## III.

### A.

Accepting, as we must unless clearly erroneous, the factual determinations made by the district court concerning the circumstances of the warrantless search and seizure, it appears that the following series of events occurred on July 31, 1992. At approximately 6:45 p.m., Livingston County

Deputy Sheriffs Michael Lawry and Jeffrey Wagner, in separate patrol cars, received a general police broadcast regarding a drunk or reckless driver. The broadcaster provided a description of the vehicle, the license plate number, and a description of the driver. Deputy Wagner spotted a vehicle matching the description at the Oasis Truck Stop at the intersection of M–59 and U.S. 23 in Livingston County, Michigan.

The defendant, who matched the description of the driver, was standing between the vehicle and a set of phone booths. Deputy Wagner drove up to Erwin in a marked police vehicle and made eye contact with Erwin. According to Wagner, Erwin appeared nervous. As Wagner got out of his vehicle to approach Erwin, it appeared to the deputy that Erwin was attempting to get back into his car and "flee" the scene. Deputy Wagner advised Erwin to "stay there" and told him why he was stopped. As Wagner approached Erwin, Wagner noticed a cellular phone on the front seat of Erwin's vehicle and noticed that one of the cushions in the backseat was loose. According to Wagner, Erwin did not say very much, but appeared nervous; he took his hat off several times, rubbed his hand though his hair, and rubbed his hands together. Erwin was wearing a jogging suit, gym shoes, and a lot of jewelry.

Erwin complied with Wagner's request for Erwin's driver's license, but explained when asked for the car's registration and proof of insurance that the car was borrowed from a friend who had rented it. Wagner returned to his patrol car to run a standard-procedure LEIN check on Erwin. The dispatcher advised Wagner that Erwin had several prior convictions for drug and weapons offenses, and that Erwin had recently finished a term of parole. As the dispatcher was relaying this information, Deputy Lawry, who also heard the radio broadcast, arrived at the scene. Lawry asked Wagner if he had patted Erwin down. When Wagner answered that he had not, Lawry approached Erwin in order to do so.

Lawry testified that Erwin was extremely nervous. He noted that Erwin was sweating profusely, that his eyes were darting around, that he kept taking off his hat and running his hand through his hair, and that he kept reaching into his pocket. As Lawry approached the vehicle, he noted that the back cushion to the rear seat was ajar and positioned higher than normally it would be. Upon patting down Erwin, Lawry felt a square object in Erwin's pocket. Lawry retrieved from the pocket a pager, $846 in loose cash, and $135 worth of food stamps. Either immediately before, during, or immediately after the pat down, Lawry saw a black cloth case on the front passenger seat of Erwin's vehicle. Lawry testified that the case was open and that it contained a cellular phone, a small mirror, and what Lawry erroneously believed to be a cocaine spoon. In fact, the "spoon" turned out to be a blackhead remover used to treat acne.

Although the deputies were satisfied that Erwin was not under the influence of alcohol or drugs, they suspected by then that Erwin might be a drug distributor. The district court later summarized the bases for the deputies' suspicion, as established through their testimony at the suppression hearing:

> The officers were entitled to conclude that they may have found a drug distributor, displaying his success and "wealth" in the form of ostentatious jewelry, who had received a page and parked his non-forfeitable rental car near a public pay phone to make a non-interceptable call, rather than broadcasting the details of his drug deal over the airwaves with the cellular phone on his car seat. Convicted of multiple serious offenses and recently released from parole, the very nervous man in the jogging suit was possessed of nearly a[sic] $1,000 in cash or readily-convertible food chits, any part of which could have been the proceeds of the day's drug sales.

Lawry then asked Erwin how much cash he had. Erwin responded that he did not know. Lawry, referring to the articles taken from Erwin's pockets and the objects observed on the front seat of the car, asked him to whom the narcotics paraphernalia belonged; Erwin answered that he did not know. Next, Lawry asked him whether he had anything in his car that he should not have such as weapons or drugs. Erwin answered that he did not. Lawry then said, "Well, then, you don't mind if I look around in the car then, do you, or would you?" Erwin said, "[N]o." Lawry

deemed this response to be consent to search the car. Lawry did not inform Erwin that he was not obligated to consent to a search, nor did he give him a consent form to sign. Lawry later explained that he did not have a form with him. Lawry testified that, at the time he asked for permission to search, he did not have his gun drawn, he used a normal tone of voice with the defendant, and the defendant was still nervous but coherent and did not appear to be under the influence of alcohol or drugs.

A search of the vehicle uncovered one kilogram of powder cocaine packaged in a brick shape and wrapped with electrical tape. The package was retrieved from behind the loosened backseat cushion. After finding the package, Lawry instructed Wagner to place the defendant under arrest. Wagner arrested, cuffed, and placed Erwin in the patrol car.

After being indicted for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), Erwin filed a motion to suppress the evidence recovered at the Oasis Truck Stop. Relevant to this appeal, the district court heard testimony from Deputies Wagner and Lawry, credited their testimony that the defendant had given his consent voluntarily, found that Erwin "took a chance, gave a knowing consent, but lost the gamble," and denied the defendant's motion to suppress the kilogram of cocaine. Apparently, the defendant did not offer any testimony in his own behalf.

### B.

■ When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government. *United States v. Shamaeizadeh*, 80 F.3d 1131, 1135 (6th Cir.1996). Whether consent to a search is voluntarily given is a question of fact. *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir.1995), *cert. denied*, 516 U.S. 1057, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996). Thus, a district court's finding of voluntary consent will be reversed only if clearly erroneous. *United States v. Calhoun*, 49 F.3d 231, 234 (6th Cir.1995).

■ A law enforcement officer may make a brief investigatory stop of an individual so long as there is a reasonable basis for doing so. *Terry v. Ohio*, 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Specifically, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). A law enforcement officer is generally justified in stopping an individual and asking for identification when relying on information transmitted by a valid police bulletin. *See United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Obviously, stopping Erwin was proper in light of the fact that both he and his vehicle matched the description given by the general police broadcast of a possible drunk or reckless driver.

### 1.

■ After the deputies satisfied themselves that Erwin was not drunk or otherwise impaired, they were justified in continuing to detain Erwin if, by then, they had reasonable and articulable suspicion that Erwin was engaged in other criminal activity. We think, as the district court did, that the deputies were reasonably entitled to conclude that Erwin may have been a drug dealer, based on the facts that he (1) was nervous, (2) seemed to try to avoid being questioned by attempting to leave, (3) seemed to have used or was preparing to use a pay telephone to make a call when a cellular telephone was available, (4) seemed to have drug paraphernalia in his vehicle, (5) had a large amount of cash, (6) had no registration or proof of insurance, (7) had a criminal record of drug violations, and (8) had an out-of-place backseat cushion. Although many of these facts are consistent with innocence, all that is required is that the deputies' suspicion be "reasonable" and "articulable," as determined by the totality of the circumstances. *See Sokolow*, 490 U.S. at 6–8, 109 S.Ct. 1581. We find this standard was met.

■ Moreover, irrespective of whether the deputies were justified in detaining Erwin after he showed no signs of intoxication,

and even if they had not, after approaching Erwin, observed conditions raising reasonable and articulable suspicion that criminal activity was "afoot," they were entitled to ask Erwin for permission to search his vehicle. A law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). This includes a request for consent to search the individual's vehicle. *United States v. Dunson,* 940 F.2d 989, 994 (6th Cir.1991). And, this consent is not vitiated merely because the valid suspicion of wrongdoing for which an individual has been stopped proves to be unfounded or does not result in prosecution and the individual is free to go before being asked. *See Ohio v. Robinette,* 519 U.S. 33, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Of course, when a law enforcement officer no longer has any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave, and if the officer rejects the individual's indication that he would like to leave, valid consent can no longer be obtained. The fruits of a search conducted under these circumstances would have to be suppressed.

Here, the deputies, in continuing to detain Erwin for further at-the-scene questioning, given what they observed, proceeded eminently reasonably. To have simply sent Erwin on his way, without brief further questioning at the very least, would have been plainly unreasonable, even inept, police work.

Therefore, we hold that the deputies did not violate Erwin's constitutional rights when, after determining that he was not, or more precisely had not been, a drunk or impaired driver, they continued to detain him briefly to request his consent to search his vehicle.

## 2.

The second of the two questions that must be answered is whether Erwin's subsequent consent to search the vehicle was voluntary. "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proving that consent was voluntary is on the government. *Id.* at 222, 93 S.Ct. 2041. "[C]onsent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.1978). The defendant's knowledge of his right to refuse to consent is a factor, but the government need not prove that the defendant had such knowledge to establish that consent was voluntary. *Schneckloth,* 412 U.S. at 226–27, 93 S.Ct. 2041.

The district court concluded that the " 'knowing and intelligent consent' argued by the government has been proven by a preponderance, with evidence that is clear and convincing.... The defendant was not threatened and nothing about the atmosphere was coercive from the perspective of a rational person." This conclusion is not clearly erroneous.

 Lawry asked Erwin whether he had anything in his car that he should not have such as weapons or drugs. Erwin answered that he did not. Lawry then said, "Well, then, you don't mind if I look around in the car then, do you, or would you?" Erwin said, "[N]o." Erwin objects to the form of the "question," arguing that it was really a statement. We disagree. Although it was not a neutral question, it plainly sought Erwin's permission to search the vehicle; the defendant still could have refused to consent to the search. Erwin does not allege that he did not have knowledge of his right to refuse to consent. Additionally, the deputies did not remove the defendant from the parking lot of the truck stop; they did not make any show of force, such as drawing their weapons or touching the defendant; and both deputies testified that they did not employ stern or threatening language. Thus, the district court did not clearly err in concluding that the defendant's consent was voluntary. Consequently, Erwin's motion to suppress was properly denied.

## IV.

### A.

On June 16, 1993, Erwin was charged in a one-count criminal complaint in the Northern Division of the Eastern District of Michigan at Bay City with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). During the defendant's appearance before a magistrate judge on June 23, Erwin requested that the case be transferred from the Northern Division in Bay City to the Southern Division in Flint, which is closer to the Livingston County location where Erwin was arrested. On June 24, the magistrate judge granted the request under Local Rules 200.1 and 100.1(c) and (d), since amended, of the Eastern District of Michigan.

Six days later, on June 30, a grand jury in the Northern Division at Bay City indicted the defendant on six drug-related counts. Counts One through Five alleged various drug activities occurring in the Northern Division. The counts were founded on warrant-based searches of two houses in Saginaw, Michigan, which is located in the Northern Division. Count Six charged Erwin with intent to distribute the drugs found in his vehicle at the Oasis Truck Stop in Livingston County, part of the Southern Division. Based on the government's request, the one-count complaint, which had been filed in the Northern Division on June 16 and transferred to the Southern Division, was dismissed on July 20, 1993. The six-count indictment was assigned to the Northern Division, and Erwin was arraigned in the Northern Division in Bay City, also on July 20. At the arraignment, Erwin objected to the proceedings taking place in the Northern Division.

On July 29, 1993, Erwin filed a motion in the Southern Division to correct the allegedly improper assignment of the indictment to the Northern Division. Although it is unclear how a Northern Division court ruled on a motion filed in the Southern Division, the district court for the Northern Division denied the motion, ruling that the June 24 order transferring the case to Flint was void because the magistrate judge acted beyond the scope of his authority when he made such a ruling without a reference from a district court judge. According to the district court, because the indictment alleged crimes occurring in the Northern Division and because the case could not be considered as already proceeding in the Southern Division, the case was properly assigned to the court at Bay City.

### B.

■ Although the Sixth Amendment and Fed.R.Crim.P. 18 require that a defendant's trial take place in the *district* where the crime was committed, there is no constitutional or statutory requirement that a defendant's trial take place in a specific courtroom or *division* within a federal judicial district. *See* U.S. CONST. amend. VI; Fed.R.Crim.P. 18; *United States v. Reynolds,* 64 F.3d 292, 296 (7th Cir.1995), *cert. denied,* 516 U.S. 1138, 116 S.Ct. 969, 133 L.Ed.2d 890 (1996). Prior to 1966, Fed.R.Crim.P. 18 provided a statutory right to trial in the division where the defendant's offense allegedly occurred. In 1966, however, that right was eliminated. Rule 18 now reads:

> Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a *district* in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

(Emphasis added.)

■ In 1993, Rule 100.1(c) of the Local Rules for the Eastern District of Michigan directed the clerk of the court to assign certain cases to specific divisions depending on where the offense occurred. Rule 100.1(a) provided that crimes alleged to have been committed in Livingston County be assigned to Flint, in the Southern division, and those alleged to have occurred in Saginaw be assigned to Bay City, in the Northern Division. There was no rule providing for the assignment of cases in which crimes were alleged to have been committed by a single defendant in both the Southern and Northern Divisions. Thus, it appears, ignoring for the moment the June 16 complaint, that the six-count indictment could have been assigned to either the Northern or the Southern Division

under the local rules. Therefore, in the absence of any evidence that Erwin was prejudiced by the assignment to the Northern Division, the only ruling that may be challenged by the defendant is the district court's voidance of the magistrate judge's transfer to Flint of the June 16 complaint.

Local Rule 72.1(b)(1) of the Eastern District of Michigan provides that magistrate judges "may perform any of the duties authorized [by Local Rule 72.1(a) ] upon specific reference by a [district court judge]." Rule 72.1(a), subsection (2)(C), allows a magistrate judge to

> hear and determine any non-dispositive pretrial motions in civil and criminal cases, and hear and recommend the determination of any dispositive motions in such cases.

Local Rule 100.1(d) governed improper assignments. That rule provided:

> A case improperly assigned to a place of holding court shall be transferred to the proper location by order of the Court.

Thus, although a magistrate judge who had been *specifically referenced* by a district judge to hear and determine Erwin's June 23, 1993, transfer motion would have had to transfer Erwin's case to Flint, the district court for the Northern Division correctly held the transfer void. Having been done *without* a specific reference as required by Rule 72.1(b)(1), the magistrate judge's transfer order was beyond the scope of his authority.

Although the prosecution's conduct is strongly suggestive of judge shopping, we have previously held, in a case alleging that the government purposely tried to assign a case to a particular judge:

> Even when there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with local rules, the defendant is not denied due process as a result of the error unless he can point to some resulting prejudice.

*Sinito v. United States,* 750 F.2d 512, 515 (6th Cir.1984). In laying down this rule, we reasoned:

> Local rules governing the assignment of cases are designed as internal housekeeping rules to promote the efficient operation of the district courts; they are not meant to confer rights on litigants.

*Id.* Erwin has alleged no prejudice, and the record does not evidence any.

Absent the void transfer, the original one-count complaint was still pending in the Northern Division on June 30 when the grand jury in the Northern Division returned the six-count indictment alleging crimes in the Northern Division. Thus, the district court did not err in ruling that the Northern Division at Bay City was a proper venue.

## V.

For the foregoing reasons, the judgment of conviction is **AFFIRMED**.

BOYCE F. MARTIN, JR., Chief Judge, with whom Judges JONES, MOORE, and COLE join, dissenting.

We have here the simple question of whether there are limits on detentions and searches based on reasonable suspicion. Can law enforcement officers extend a detention and increase the extent of their search until they find conclusive evidence of wrongdoing and elicit a consent from a detainee? The en banc majority opinion permits such activity by law enforcement officers. I believe the limits must be more sharply drawn. When discussing searches based on reasonable suspicion, we are dealing with a lesser level of Fourth Amendment protection than that provided by the probable cause standard. Previous cases have emphasized the importance of limiting searches based on mere reasonable suspicion, whereas the en banc majority has expanded the ambit of searches based on reasonable suspicion. I respectfully dissent because I do not wish to erode the Fourth Amendment's protections further.

Defendant James Erwin, Jr., is not a sympathetic character. He has a lengthy criminal record that includes several drug offenses. The police found a kilogram of cocaine in his car. Nonetheless, his Fourth Amendment rights were violated, and the standard the en banc majority sets here will provide the opportunity for law enforcement officers to violate Fourth Amendment rights in the future. This dissent is not about

setting drug dealers free; it is about using the proper methods under the Fourth Amendment in apprehending them. The next citizen whose Fourth Amendment rights are violated to the extent that Erwin's rights were impinged is not likely to be carrying a kilogram of cocaine, but he will feel the same lashing injustice of an unconstitutional search.

The touchstone for judging searches and seizures of this nature is reasonableness, and the Supreme Court sets out the test in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968): "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868. The stop in this case is analogous to a *Terry* stop. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). I take issue not with whether the stop was initially justified, but rather with the officers' extension of the search beyond its allowable scope.

## I.

I will not go into an extensive rendition of the facts because the en banc majority already has done so, but I will highlight those facts germane to the scope of the search. On July 31, 1992, Livingston County Deputy Sheriff Jeff Wagner heard a police radio call for a possibly drunk and reckless driver. There was no indication in the radio call of suspicion of drug trafficking or possession of narcotics. Erwin and his vehicle matched the broadcast description, and Wagner approached Erwin at a truck stop in response to the call. Wagner testified that Erwin merely looked "nervous." In his contemporaneous report, Wagner had described Erwin as just "somewhat nervous." Wagner did not say at what point he determined that Erwin was not intoxicated, but Wagner gave no indication that he ever thought Erwin was intoxicated. Wagner testified in the suppression hearing that "I didn't smell an odor at that particular time," and that he did not observe that Erwin had glazed eyes, slurred speech, dilated pupils, or any other indicia of intoxication.

Livingston County Sheriff Deputy Michael Lawry arrived on the scene while deputy Wagner was running a warrant and license check. Deputy Lawry gave no indication that he ever thought Erwin was drunk. "Alcohol definitely not," Deputy Lawry testified at the suppression hearing. "I didn't smell any alcohol on him, he didn't exhibit any characteristics." Deputy Lawry also quickly realized Erwin was not intoxicated with controlled substances: "[H]e was very cognizant of what was going on and aware of what was happening." Deputy Lawry admitted that he realized Erwin was not intoxicated with controlled substances "upon approach and observation of him, yes." Neither officer performed a roadside intoxication test. Deputy Lawry nonetheless continued to detain Erwin and eventually gained Erwin's consent for a car search.

## II.

The nearly instantaneous realization that Erwin was not intoxicated should have ended the encounter, but it did not. Ultimately, the chain of evidence progressed from observance of Erwin's nervous demeanor to the sighting of a cellular phone, mirror, and blackhead remover in the car to the discovery of a pager and nearly a thousand dollars worth of cash and food stamps in Erwin's pocket to the discovery of cocaine somewhere in the rear of the car. The chain should have been nipped long before the discovery of the cocaine.

The brevity and limited nature of *Terry*-type stops have been affirmed repeatedly. *See, e.g., United States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994). In *Terry* the Supreme Court simultaneously created the possibility for limited searches based on reasonable suspicion and limited the application and scope of such searches. "The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19, 88 S.Ct. 1868 (internal quotation marks omitted). "[U]nless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer*, 468 U.S. at 439–40, 104 S.Ct. 3138. Erwin, however,

was detained until the officers did have probable cause to arrest him.

Erwin's demeanor and physical condition quickly allayed any concerns the law enforcement officers may have had regarding his inebriation. Once the possibility of inebriation was disproven, as it quickly was, there was no support for a continuing and more intrusive search. Given that Deputy Wagner never performed a roadside sobriety test and never seemed seriously to question Erwin's sobriety, the point at which his suspicions were put to rest would appear to have been very early in the chain of events—before Deputy Lawry even arrived. At that point, all Deputy Wagner knew was that Erwin appeared "nervous" and that he was wearing some flashy jewelry. "[N]ervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995). Erwin should have been released, not detained while the deputies managed to cobble together enough incriminating evidence to arrest him.

Everything Deputy Lawry discovered should be factored out of the equation. Erwin had disproven the original justification for the *Terry* stop, and Deputy Wagner should have released him. "When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *Obasa,* 15 F.3d at 607. The officers did not have reasonable suspicion to continue their search, let alone probable cause.

### III.

I disagree with the en banc majority's answer to the "second question"—whether consent to search was voluntary—for two reasons. First, I believe there are significant questions whether Erwin's consent was free and voluntary and unequivocal. In addition, I believe that the combination of the unlawful detention and the nebulous nature of the consent made Erwin's consent invalid.

The facts of the case seem to indicate that the district court clearly erred in determining that the consent was voluntary. Consent is judged under the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams,* 754 F.2d 672, 674–75 (6th Cir.1985). Deputy Lawry characterized the consent exchange in this way: "I said: Well, then, you don't mind if I look around in the car then, do you, or would you? He again responded no." This is far from an unequivocal consent, particularly when considering that Erwin continued to hide the trunk key in his sock and shoe. Deputy Lawry's testimony regarding the consent was also far from "clear and positive." Deputy Lawry conceded that he could not remember the exact words he used to obtain Erwin's consent, and Lawry obtained no written consent from Erwin. Deputy Wagner testified that "I can't say, word for word" what Deputy Lawry said in requesting consent. A questionable consent hazily recollected fails to meet constitutional requirements.

Regardless of whether the consent was voluntary, it never would have occurred had the deputies released Erwin when they realized he was not intoxicated. I am not advocating a bright-line rule that any consent given during an illegal detention is invalid. This Court already has rejected such a rule. *See United States v. Guimond,* 116 F.3d 166, 170–71 (6th Cir.1997). I do believe, however, that this Court must cast a strict eye toward consent given during an illegal detention. I would recommend following the approach advocated by the Tenth Circuit. In *United States v. Walker,* 933 F.2d 812 (10th Cir. 1991), that court put forward the following standard: "If the consent is not sufficiently an act of free will to purge the primary taint of the illegal detention, however, it must be suppressed as 'fruit of the poisonous tree.'" *Id.* at 817 (quoting *United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir.1989)). Given its questionable nature, Erwin's consent was not sufficient to purge the taint of the illegal detention. The cocaine discovered in the search of Erwin's car should have been suppressed as the fruit of the poisonous tree.

## IV.

The en banc majority's position would allow law enforcement officers to bootstrap full-scale searches onto *Terry* searches. Even if the detainee clearly has not done the act for which he was stopped, the police will find something—nervousness, perhaps; or flashy clothing, possibly; or a general shiftiness—to justify continuing the detention. The en banc majority validates this sort of police action in this case and for future cases. Whether the police eventually do find something incriminating in their extended *Terry* searches, the civil rights of the guilty and innocent will suffer in the process.

At the point where the call leading to the initial *Terry* search has been cleared, the officer must have probable cause to continue. Deputies Wagner and Lawry did not in this case. Furthermore, if the officers do illegally extend a *Terry* stop and subsequently elicit consent to search during their unlawful detention, they should have to meet a higher standard to show that consent was voluntary. They have not done so in this case. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18, 88 S.Ct. 1868. This was just such a search, and I respectfully dissent from the en banc majority's decision to allow the fruits of this search into evidence.