RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0328p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-2058

CHE BORGESS HUFFMAN,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80599—Robert H. Cleland, District Judge.

Argued: July 18, 2006

Decided and Filed: August 30, 2006

Before: GILMAN and SUTTON, Circuit Judges; WISEMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jonathan M. Epstein, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Matthew J. Schneider, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Jonathan Epstein, Loren Gross, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Matthew J. Schneider, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

GILMAN, J., delivered the opinion of the court, in which SUTTON, J., joined. WISEMAN, D. J. (pp. 11-13), delivered a separate dissenting opinion.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit judge. Officers Deonne Dotson and Nathaniel Womack, police officers with the City of Detroit Police Department, responded to a 911 call reporting that shots had been fired at the residence located at 5742 Lonyo Street. When the officers arrived, they

_____

[*] The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle District of Tennessee, sitting by designation.

observed bullet holes as well as broken glass on the premises. The officers knocked and announced their presence, but no one answered. They then climbed through a partially open window to make sure that no one inside was injured from the gunshots. While walking through the house, they found Che Huffman asleep with a fully loaded assault rifle within arm's reach. Huffman also possessed ammunition and a fully loaded "banana clip" in his pocket. Based on this evidence and Huffman's post-arrest statements, he was charged with the following three counts: (1) possession of a firearm by a felon, (2) possession of a firearm by an illegal drug user, and (3) possession of ammunition by a felon.

The district court denied Huffman's motion to suppress the evidence seized as a result of the officers' warrantless entry into the residence and, following a conditional guilty plea, Huffman was sentenced to 96 months of imprisonment followed by 3 years of supervised release. On appeal, Huffman argues that the district court erred in denying his motion to suppress and in applying a four-level increase pursuant to § 2K2.1(b)(5) of the now-advisory United States Sentencing Guidelines. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

On June 28, 2004, a caller alerted the City of Detroit's 911 call center that shots had been fired at the residence next door to the caller's. Although the 911 call was placed around noon, the caller reported that the shots had been fired approximately eight hours earlier—at "four o'clock at night." The 911 dispatcher immediately requested police officers to respond, warning the officers that shots had been fired and that someone inside the house might be potentially shot, injured, or killed. He neglected to tell the officers, however, when the shots were fired.

Minutes after receiving the dispatch, Officers Dotson and Womack arrived at the scene. They noticed multiple bullet holes in the front windows of the house, and they stepped over shards of glass on the front porch. Upon peering through the windows, which were not obstructed by curtains or blinds, Dotson and Womack observed bullet impact marks on the interior walls of the house. They also saw several pieces of furniture in the house—suggesting that the house was occupied. But they did not observe any blood or other signs that someone inside the house had been injured or killed. Based on their experience in the field, Dotson and Womack believed that the bullet marks on the exterior and interior walls of the house were consistent with those fired from automatic weapons commonly used in drive-by shootings in the area.

The officers knocked on the front door and announced their presence, but they received no answer. They then consulted with two neighbors at the scene, who confirmed that there had been shots fired earlier. The neighbors, however, did not specify the time of the shooting, and they were not asked if they had heard any sounds indicating that someone was injured as a result of the gunshots. Dotson and Womack again shouted "police, police" into the house, but still received no answer. After trying the front doorknob and finding it locked, the officers climbed into the house through a partially-open window.

The officers found Huffman asleep in a chair. A fully loaded automatic assault rifle with a laser scope was on the table directly in front of him. After waking Huffman up, the officers placed him under arrest. They then searched Huffman and found a fully loaded "banana clip" and additional ammunition in his pocket. He was later charged with (1) possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), (2) possession of a firearm by an illegal drug user in violation of 18 U.S.C. § 922(g)(3), and (3) possession of ammunition by a felon in violation of 18 U.S.C. § 922(g)(1).

Following his arrest, Huffman gave two statements to the authorities. The first one, given to the Detroit Police Department, was transcribed as follows:

> Q:     Do you wish to tell me what happened when the officers saw you?
> A:     I sleep [sic] in a drug coma[.]  I was sleep[ing] from using drugs 4 days in a
>        row.
> Q:     What kind of drugs?
> A:     Crack cocaine.
> Q:     Do you live on Lonyo?
> A:     Yes, I was staying there because I have nowhere else to stay.
> Q:     So you knew there was a gun in the house?
> A:     No.  I had left, and when I came back in I saw it [and] then I went to sleep.

His second statement, this one given to the Bureau of Alcohol, Tobacco, and Firearms (ATF), reads in relevant part as follows:

> I had been living [at 5742 Lonyo] for about 1 month.  I have a bedroom there and I live there with Dee and Mike.  A guy named Andre rents the house.  A guy named Steve and a guy named DJ supply drugs to my house and the house next door. . . . DJ and Steve are having a feud over who is going to supply dope to our house and the house next door.  They got into a fight a couple nights ago and DJ stated that if he can't sell dope in our house then nobody would. . . . Steve brought the [weapon] to the house a couple of days ago after the argument.  Last night I was in the room with a girl and I heard shots fired.  It sounded like a full automatic machine gun.  Mike and Dee were also in the house.  Nobody got shot.  I then went next door and spent the night at Charlie's house.  This morning I came back home and put the [weapon] in my bedroom.  I also picked up some of the bullets in my pocket.  I then got high and fell asleep.  Next thing I know, the police were standing over me with their guns out.  The [weapon] was about 3 feet from me.  I never shot that gun.  The only reason my prints would be on that gun is because I moved it today.

Huffman moved to suppress the evidence found as a result of the warrantless search. Following a suppression hearing, the district court denied Huffman's motion, concluding that the facts were sufficient to establish exigent circumstances justifying entry into the residence without a warrant.  Huffman then entered a conditional plea of guilty to all three counts in the indictment without the benefit of a plea agreement.

The probation officer issued a Presentence Report (PSR), in which he assigned Huffman a base offense level of 18 and a criminal history category of IV.  As a result of this calculation, the PSR recommended a sentencing range of 57-71 months.  Both the government and Huffman filed objections to the PSR.  The government argued that Huffman's offense level should be increased by four levels because Huffman possessed the firearm and ammunition as tools in the drug trade. *See* U.S.S.G. § 2K2.1(b)(5) (providing for increased offense levels where the offender uses or possesses firearms or ammunition in connection with another felony offense).  As a result of the government's objection, the probation officer increased Huffman's recommended offense level from 18 to 22.  The government later filed a motion to lower Huffman's level by one due to his acceptance of responsibility, thus reducing his offense level to 21, which resulted in a sentencing range of 77 to 96 months of imprisonment.

Huffman's objection to the PSR related to its classification of 5742 Lonyo as a "flophouse/smokehouse" rather than as his residence.  The district court found no merit in Huffman's argument.

Over Huffman's objection, the district court agreed that the four-level increase for using a firearm and ammunition in connection with another felony offense was proper because Huffman was "involved directly in the operation, or at least intended operation of a dope house, a house from

which drugs would be sold to others." The district court also found that when Huffman was discovered by the police, he was "in the process of fortifying that location with a fully automatic weapon." Huffman was sentenced at the top of his revised Guidelines range to 96 months of imprisonment followed by 3 years of supervised release. On appeal, Huffman argues that the district court erred in finding that the warrantless search was supported by exigent circumstances, and that it further erred in relying solely on Huffman's own statements against interest in applying the four-level increase pursuant to U.S.S.G. § 2K2.1(b)(5).

## II. ANALYSIS

### A.    Denial of Huffman's motion to suppress evidence

Huffman first challenges the district court's denial of his motion to suppress evidence, arguing that the evidence was seized as a result of an improper warrantless search of his residence. In reviewing a motion to suppress, we accept the district court's factual findings unless clearly erroneous, but review its legal conclusions de novo. *United States v. Ogbuh*, 982 F.2d 1000, 1003 (6th Cir. 1993) (reversing the denial of a motion to suppress). When a district court has denied a motion to suppress, we consider the evidence in the light most favorable to the government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). We will overturn the district court's factual findings only if we have a "definite and firm conviction that a mistake has been committed." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (citation and quotation marks omitted).

The Fourth Amendment to the United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The "chief evil" against which the Fourth Amendment protects is the physical invasion of the home, and the Fourth Amendment requires that searches of the home be reasonable. *United States v. Thacker*, 328 F.3d 244, 252 (6th Cir. 2003) (quoting from *Payton v. New York*, 445 U.S. 573, 585 (1980)). One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home. *Id.* If the police enter a home without a warrant, the entry is presumptively unreasonable unless the government proves otherwise. *Ogbuh*, 982 F.2d at 1003.

The Supreme Court has carefully crafted certain exceptions to the warrant requirement, one of which is the exigent-circumstances exception. Pursuant to this exception, the government can overcome the presumption that a warrantless entry is unreasonable if it proves that "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006) (citation and quotation marks omitted). The Supreme Court has articulated four situations that may give rise to exigent circumstances: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *Id.* In the present case, the "risk of danger" exigency is the one implicated. *See id.* ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.").

This exigency has been most frequently applied in cases where the government actors were performing "community-caretaker" functions rather than traditional law-enforcement functions. *See*

*e.g., Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (applying the risk-of-danger exception to a warrantless entry of a burning building); *Thacker,* 328 F.3d at 255 (applying the risk-of-danger exception where the police entered a home without a warrant in response to a 911 call reporting an injury). The Supreme Court recently clarified in *Brigham City*, 126 S. Ct. at 1948, however, that whether the officers' motivation for entering is to arrest suspects and gather evidence or to assist the injured is irrelevant so long as the circumstances objectively justify the action. *Id*. (approving the police officers' warrantless entry into a house to break up a fight in progress); *see also United States v. Whren*, 517 U.S. 806, 813 (1996) (holding that "subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional") (citation and quotation marks omitted).

The government, in order to satisfy the exigent-circumstances exception in the present case, must show that there was a risk of serious injury posed to the officers or others that required swift action. *See id*. In reviewing whether exigent circumstances were present, we consider the "totality of the circumstances and the inherent necessities of the situation at the time." *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (citation and quotation marks omitted).

The Supreme Court in *Brigham City* held that there was a risk of danger satisfying the exigent-circumstances exception where police officers witnessed through the windows of a house an altercation involving several people in which one man spat blood into a sink after being punched in the face while others attempted to restrain the man responsible for the punch. 126 S. Ct. at 1949. Emphasizing the need for an immediate response (which counseled against first obtaining a warrant), the *Brigham City* Court noted:

> Nothing in the Fourth Amendment required [the police officers] to wait until another blow rendered someone 'unconscious' or 'semi-unconscious' or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.

*Id*.

This court has also had occasion to apply the risk-of-danger exception. In *Thacker*, for example, both police officers and paramedics responded to a 911 call placed from a home belonging to Thacker and his live-in fiancee. Thacker's fiancee reported that Thacker had cut himself, but she was unable to provide the dispatcher with more details. When the police arrived at the scene and Thacker answered the door, the police noticed that there was broken glass and bloodstains on the floor and that Thacker was bleeding profusely. Thacker was drunk and belligerent, and the police did not consider him to be a credible source of information regarding the injury. Although Thacker requested that the paramedics enter while refusing entry to the police, the police nevertheless entered in order to investigate whether there were others in the apartment who were injured or who could pose a threat to the paramedics. Due to the police officers' need to quickly ascertain whether anyone was injured in response to the 911 call, and to protect themselves and the paramedics, this court in *Thacker* held that the risk-of-danger exception validated the warrantless search. *Id*. at 255; *see also Causey v. Bay City*, 442 F.3d 524, 530 (6th Cir. 2006) (holding that the risk-of-danger exception validated the warrantless entry of a home when the officers relied on information that gunshots had been fired from a residence, that no one had left or entered the residence since the shots were fired, and that no one answered the door); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (holding that the risk-of-danger exception validated the warrantless entry of a home in order to free a sexual assault victim who was being held against her will).

In the present case, the police officers responded to a 911 call reporting gunshots at the residence where Huffman was ultimately found. Whether or not the dispatch alone would have been sufficient to justify a warrantless entry, the fact is that the officers here conducted an additional

investigation upon arriving at the scene. *See Thacker*, 328 F.3d at 254 n.2 (holding that a 911 dispatch, combined with the officers' observations of facts indicative of exigent circumstances, justified a warrantless entry). They discovered multiple bullet holes in the front windows of the home as well as shards of glass on the front porch. Upon peering through the window, the officers also observed bullet holes on the walls inside the house as well as furniture, suggesting that the house was lived in at the time of the incident. Based upon their experience in the field, the officers surmised that the bullet holes were caused by an automatic weapon of the type commonly used in drive-by shootings. The officers then entered the home—after knocking and announcing their presence—"to be sure that there was no one injured on the inside."

Although Huffman admits that the officers reasonably believed that shots had been fired, he argues that there was no exigency because the shots were fired approximately eight hours before the officers arrived at the scene. This eight-hour delay, according to Huffman, meant that swift action was unnecessary because the "situation did not reasonably pose any significant risk of danger to the police or others." He also contends that the officers' failure to observe blood or other signs of gun-related injuries should have signaled to them that no one was in need of immediate care.

The government counters, however, that "[r]egardless of when the officers believed the shots had been fired, the officers reasonably believed that someone inside could be dying, or could be severely injured." Their assessment of the level of danger and the need for immediate action, moreover, was a result of the 911 call reporting shots fired as well as observations on the scene—particularly the shards of glass on the front porch—leading them to believe that the shots were *recently* fired. As the government argues, "the shooting was so recent that no one had repaired or even performed the most basic cleaning of the house after the shooting." *See United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002) (affirming the denial of a motion to suppress based on the exigent-circumstances exception where "nothing at the [] home dissuaded the officers from believing the veracity of the 911 calls" reporting shots fired). The government thus argues that the objective circumstances justified a warrantless entry under the risk-of-danger exception.

Officer Dotson also testified that he was not aware that the shots were fired eight hours earlier. He therefore responded to the scene as if the shots had been fired immediately before the caller reported the incident to the 911 call center. Huffman, however, points to the police report filed by Womack, which states that the "loc[ation] had been shot up on the previous night." According to Huffman, the inclusion of this statement in the police report indicates that the officers knew at the time that the shots had been fired hours before they arrived on the scene. *See United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) (holding that courts "may mutually impute the knowledge of all the agents working together on the scene and in communication with each other"). Huffman does not argue that the knowledge of the 911 dispatcher is imputable to the officers, and we have no occasion to address that question here.

The relevant inquiry, therefore, is what the officers knew when they arrived at 5742 Lonyo. As the district court noted, neither Huffman nor the government provided any evidence regarding the preparation of Officer Womack's report. The report does not indicate, for example, when he prepared the report or what sources of information (such as the dispatch tape) he consulted in its preparation. Officer Dotson's testimony during the suppression hearing in district court is the only evidence available concerning the officers' knowledge at the time of the warrantless entry, and Dotson made clear at various points throughout his testimony that he "ha[d] no memory as to when the[] shots had been allegedly fired[.]" Taking the evidence in the light most favorable to the government, see *Erwin*, 155 F.3d at 822, we will presume that the officers were not aware that the shots had been fired approximately eight hours before they arrived on the scene.

We recognize that in the previous cases in which this court has upheld a warrantless search based on an exigent-circumstances theory, the officers had more definitive information that either

someone was in possible danger or that someone posed a risk to the officers. *See, e.g.*, *Causey*, 442 F.3d at 529 (the officers knew that no one had left or entered the residence after several gunshots were fired); *Thacker*, 328 F.3d at 254 (Thacker answered the door with blood on both his legs and boxer shorts and refused to explain the situation). The two dispositive factors consistently found in these cases, however—the potential for injury to the officers or others and the need for swift action, *see Brigham City*, 126 S. Ct. at 1949; *Thacker*, 328 F.3d at 252-255; *Johnson*, 22 F.3d at 680; *Holloway*, 290 F.3d at 1334-40—are found in the present case regardless of the absence of blood or other telltale signs of injury.

Not only did the 911 call report shots fired at 5742 Lonyo, a residential address, but the officers' additional, albeit brief, conversation with neighbors confirmed that shots were indeed fired at the residence. The officers also observed bullet holes in the exterior and interior walls of the house—a house that looked as if occupants presently resided there. The unswept shards of glass on the front porch of the residence, along with the officers' belief that the shots had been recently fired, suggested that the risk of danger was still imminent. All of these facts, taken together, created a set of circumstances in which the officers were justified to enter the residence without a warrant. The warrantless entry, moreover, may not be held unconstitutional simply because the reasonable concerns of the officers were not substantiated after-the-fact. *See Holloway*, 290 F.3d at 1340 ("The fact that no victims are found, or that the information ultimately proves to be false or inaccurate, does not render the police action any less lawful.").

Based on the above analysis, we need not consider whether the warrantless entry would fall under the exigent-circumstances exception even if the officers had known that the shots had been fired at least eight hours before they arrived at the scene. We must address, however, whether the firearm and the ammunition were lawfully seized.

The officers encountered Huffman during a walk-through of the residence, and the assault rifle was lying on the table in plain view. *See Rohrig*, 98 F.3d at 1525 (holding that once the officers entered a residence due to exigent circumstances, they were entitled to seize marijuana plants because the plants were in plain view). This is distinguishable from the circumstances in *Johnson*, 22 F.3d at 679, where the court held that the officers' warrantless seizure of firearms from a closed closet was not justified by the exigent-circumstances exception because they had ample time to secure a warrant. Here the assault rifle was in plain view. We therefore affirm the denial of Huffman's motion to suppress the evidence.

**B.     Application of the four-level enhancement pursuant to U.S.S.G. § 2K.2.1(b)(5)**

In reviewing a district court's application of the Sentencing Guidelines, we will accept the district court's findings of fact unless they are clearly erroneous, and we will give due deference to the district court's application of the Guidelines to the facts. *United States v. Williams*, 355 F.3d 893, 897-98 (6th Cir. 2003). The district court in the present case applied a four-level sentencing enhancement pursuant to U.S.S.G. § 2K2.1(b)(5) based on drug-related admissions included in the statements that Huffman gave to the Detroit police and to the ATF. Section 2K2.1(b)(5) provides as follows:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.

The district court agreed with the government that the following facts admitted by Huffman in his statements justified the increase: (1) Huffman was living in a house used for the distribution of illegal drugs, (2) two rival drug lords supplied drugs to his house and were having a feud, (3) one

of the dealers brought the assault rifle—later found with Huffman—to the house for protection, (4) Huffman armed himself with the gun and ammunition following the shooting reported in the 911 call, and (5) Huffman and a woman smoked crack cocaine following the shooting. Because a drug dealer loaned the gun to Huffman, the government argues that Huffman had reason to believe that the dealer would return to retrieve the gun and use it as a tool in the drug trade.

The district court agreed with the government, but it did not explicitly identify the "other felony offense" that it found was linked to Huffman's use of the firearm. A review of the sentencing transcript, however, indicates that the district court proceeded on the basis that Huffman had used the firearm in connection with running a drug house, an offense prohibited under 21 U.S.C. § 856(a).

Huffman objected to the imposition of the four-level increase. He argues on appeal that the district court erred in basing the increase on Huffman's statements against interest without requiring corroboration, and further erred in concluding that Huffman was using the firearm in connection with another felony offense. We will address Huffman's arguments in turn.

### 1.     *The use of Huffman's statements against interest*

Huffman first argues that the district court erred in imposing the four-level enhancement based on Huffman's statements at the time of his arrest. He relies on *Opper v. United States*, 348 U.S. 84 (1954), in which the Supreme Court held that a conviction cannot rest on a defendant's out-of-court statements made subsequent to the crime unless the government provides independent evidence that tends to establish the trustworthiness of the statements. *Id.* at 92-93. The rationale behind the rule articulated in *Opper* is that voluntary statements "may be unreliable because they are coerced or induced," and that they "may reflect the strain and confusion attending [defendant's] predicament rather than a clear reflection of his past." *See Smith v. United States*, 348 U.S. 147, 153 (1954) (requiring an admission made after an arrest to be corroborated when "the statement embraces an element vital to the Government's case").

Although the independent evidence does not have to be sufficient in and of itself to justify the conviction, it must corroborate the defendant's admission that the offense occurred. *See Opper*, 348 U.S. at 93 ("[The independent evidence] tends to make the admission reliable, thus corroborating it while also establishing independently [any] other necessary elements of the offense."); *Smith*, 348 U.S. at 156 ("[O]ne available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."); *see also United States v. Trombley*, 733 F.2d 35, 37-38 (6th Cir. 1984) (holding that the purpose of the corroboration requirement is to ensure that a defendant's statements are trustworthy). Huffman argues that aside from his own statements against interest, "there was no evidence . . . that indicated the occurrence of another felony."

The government responds by arguing that the corroboration requirement does not apply in the sentencing context. Unlike *Opper, Smith*, and *Trombley*, the present case is not one in which the defendant's statements themselves provided the grounds for the conviction. Huffman entered a conditional plea of guilty on all three counts—meaning that the facts gleaned from Huffman's admissions were used only to apply the four-level increase pursuant to § 2K2.1(b)(5) of the Guidelines. This court has held, albeit in an unpublished opinion, that "the corroboration rule in *Opper* is not applicable at the sentencing stage." *United States v. Henderson*, 17 F. App'x 362, 365 (6th Cir. 2001) (holding that the district court, in sentencing Henderson, did not err in relying on his statements described in the PSR without requiring independent corroborating evidence). Explaining its rationale, the *Henderson* court reasoned that

> specific procedures, such as are required at trial, are simply not constitutionally mandated, especially when a guilty plea is entered . . . . Henderson's admissions

regarding the quantity of drugs sold were made freely, and he does not contest the truthfulness of his statements.

*Id.*

*Henderson* has not been subsequently cited by this court and, because it is unpublished, has no precedential value. Nevertheless, the reasoning in *Henderson* is persuasive. *Henderson* made the critical point that some constitutional protections required at trial are not required during the sentencing phase. *Id.*; *see also United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir. 1992) (en banc) (holding that the court may consider uncorroborated hearsay evidence during the sentencing phase so long as the statements have some indicia of reliability and the defendant is given an opportunity to refute them); U.S.S.G. § 6A1.3 cmt. (noting that district courts may consider "[a]ny information . . . so long as it has sufficient indicia of reliability to support its probable accuracy"). We therefore adopt the rule from *Henderson* and hold that the district court did not err in relying on Huffman's admissions in imposing the four-level increase pursuant to U.S.S.G. § 2K2.1(b)(5).

The rule from *Henderson* requires that Huffman's statements be shown to be reliable and voluntary. Huffman has failed to contest either of these factors, arguing only that the district court lacked additional, independent evidence in imposing the four-level enhancement. The facts provided by Huffman in his two statements, moreover, are consistent with what the officers observed at the scene where they seized the assault rifle and ammunition. This evidence tends to corroborate the fact that Huffman possessed the gun on the date in question as a method of protecting himself and the drug house in which he lived. We therefore hold that the district court did not err in basing the four-level enhancement on Huffman's admissions.

## 2. *The use of the firearm in connection with another felony offense*

Huffman also argues that the district court erred in concluding that Huffman used the firearm in connection with another felony offense. As support for his argument, Huffman emphasizes that he was asleep when the officers discovered him within arm's reach of the weapon, and that he was a drug user rather than a dealer. The district court determined, however, that "[t]he firearm was there in order to fortify that house and to react to the shooting that had occurred the night before in which the house had been shot up. The house was a dope house."

In order to justify the four-level increase pursuant to § 2K2.1(b)(5), the government has to establish that there was a nexus between the firearm and the other felony offense that is more than coincidental. *See United States v. Ennenga*, 263 F.3d 499, 503-04 (6th Cir. 2001) (affirming the district court's imposition of the four-level increase where the defendant used a gun as protection in the drug trade). This court has articulated the "fortress theory" as a means of satisfying § 2K2.1(b)(5), which applies where a defendant has used a firearm to protect the drugs, facilitate a drug transaction, or embolden himself while participating in felonious conduct. *Id.*; *see also United States v. Conley*, 93 F. App'x 55, 57 (6th Cir. 2004) (unpublished) (affirming the district court's application of § 2K2.1(b)(5) under the fortress theory where, among other things, the defendant admitted that he needed the gun for personal protection, the firearm was of a type commonly used by drug dealers, and the firearm was loaded).

The district court applied the fortress theory in the present case. In doing so, it reasoned that the assault rifle was of a type commonly used by drug dealers, that Huffman was staying at a known "dope house," that Huffman purposefully kept the gun and ammunition nearby after 5742 Lonyo was shot up the night before, and that the drug-dealing owner of the gun had entrusted Huffman with its care. These are the actions of someone intending to protect himself and the drug-related operations at 5742 Lonyo. Based on this evidence, and especially considering the deference afforded to the district court's application of the facts to the Guidelines, *see Williams*, 355 F.3d at

897-98, we find no error in the imposition of the four-level increase as part of the process by which the district court determined Huffman's sentence.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

―――――――――――――

**DISSENT**

―――――――――――――

THOMAS A. WISEMAN, JR., Senior District Judge, dissenting. The majority decision today substantially broadens the scope and application of the exigent-circumstances exception to the warrant requirement. As the majority has observed, a central tenet of Fourth Amendment jurisprudence is that police officers need a search warrant to enter a residence unless exigent circumstances justify a warrantless entry. *Payton v. New York*, 445 U.S. 573, 587–88 (1980). Because warrantless entries are "presumptively unreasonable," *id.* at 586, the government bears a "heavy burden" of proving that exigency existed. *Welsh v. Wis.*, 466 U.S. 740, 749–50 (1984). In prior cases calling for an examination of the scope of the exception, this court has consistently held that exigent circumstances exist "when 'real immediate and serious consequences' would *certainly occur* if a police officer were to 'postpone action to obtain a warrant.' " *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *Welsh*, 466 U.S. at 751) (emphasis added). Conversely, exigent circumstances have consistently been found lacking when police officers have had nothing more than "unsubstantiated suspicions" that postponing action to obtain a warrant would result in injury to themselves or others. *See, e.g.*, *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (holding in the context of the "knock and announce" requirement that "officers must have more than a mere hunch or suspicion" that an exigency exists, and noting that exigent circumstances exist when "the officers have a justified belief that someone within is in imminent peril of bodily harm"). In addition, the Supreme Court's most recent word on the subject confirmed that a warrantless entry will be justified by exigent circumstances when the police have "an *objectively reasonable basis* for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City v. Stuart*, 126 S. Ct. 1943, 1946 (2006) (emphasis added); *cf. Mincey v. Ariz.*, 437 U.S. 385, 392 (1978) (noting that many cases have recognized a "risk of danger" exception to the warrant requirement where police officers "reasonably believe that a person within is in need of immediate aid").

In this case, while it is clear that the police officers had an objectively reasonable basis for believing that the Lonyo Street residence had been recently "shot up" from the exterior, they had no reasonable, articulable basis for believing anyone was inside the house at the time (other than a general observation that the house appeared to be inhabited), much less an articulable basis for believing any such person could be in need of immediate assistance. Instead, as the district court recognized, they had an unsubstantiated suspicion that someone *might* possibly have been inside the house when the shooting occurred and *might* have been injured. In my view, this type of speculation should not be considered to create an exigent circumstance. It is also troubling that the officers made no attempt to conduct further investigation or obtain additional information to corroborate their suspicions. Although the officers spoke briefly with the next-door neighbors who came outside when the officers arrived, they apparently did not ask the neighbors when the shooting occurred, whether they knew if anyone had been inside the house at the time of the shooting, or whether they had heard any screams, shouts, moans or any other sounds from inside the house during or after the shooting. There was no car parked in front of or beside the house to indicate that someone was home. Again, the police officers simply had no reasonable basis for believing that anyone had been inside the house at the time of the shooting, much less that anyone might have been injured.[1]

―――――――――――――

[1] It also appears remarkably convenient that the officer who testified, Officer Dotson, had very selective recollection of the events of the day in question. Officer Dotson recalled that the dispatcher stated someone in the house might have been injured, but he did not remember anything else the dispatcher might have mentioned. He specifically did not recall whether the dispatcher told them when the drive-by shooting had occurred. Further, Officer Dotson did not recall whether the neighbors with whom he and Officer Womack spoke had said anything about when the shots occurred, whether they knew whether anyone had been inside, whether anyone inside might have been injured, or

        In every other comparable case decided by this court of which I am aware, the officers entering a home without a warrant have known, at a minimum, that someone was actually in the house at the time of the warrantless entry. *See, e.g.*, *Causey v. City of Bay City*, 442 F.3d 524, 529-30 (6th Cir. 2006) (at the time of the warrantless entry, the officers "had received a report of the shots-fired call, confirmed with the neighbor who called that six shots had been fired from [within] the 'back area' of the plaintiffs' residence, and learned from the neighbor that she had not seen anyone enter or leave the plaintiffs' property after she called the police"; the court therefore found it "reasonable for [the police] to believe that someone inside the house was willing to use a weapon and thus that an exigent circumstance existed"); *Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003) (noting that the existence of exigent circumstances in that case was "a close question," but that the police officers' observations of the bloody, injured and belligerent man who answered the door when police responded to a 911 call made from the same residence, and the need to safeguard the paramedics who had arrived at about the same time as the police, supported a finding of exigent circumstances); *Ewolski v. City of Brunswick*, 287 F.3d 492, 502 (6th Cir. 2002) (exigent circumstances justified police officers' warrantless entry when, among other things, they knew when they went to the residence that the occupant "was a mentally disturbed man who was volatile, dangerous and not taking his prescribed medication," and had been behaving in a threatening manner; he had inexplicably kept his son home from school that day; his disabled wife was also at home, and the officers observed him behaving erratically immediately prior to their decision to enter); *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996) (the presence of a weapon inside the house and the occupant's demonstrated willingness to use it constituted an exigency, particularly given that the police, when they arrived, could also hear a male voice inside the house yelling in a threatening tone; the court again noted that it was a close call, but found that an exigent circumstance existed because the officers had a "justified belief" that someone in the residence was in imminent peril of bodily harm).[2]

        I agree with the majority's observation that the two dispositive factors in each of these cases are (1) the potential for injury to the officers or others and (2) the need for swift action. Unfortunately, neither of these factors is present in this case, given that the "potential for injury" is purely hypothetical. Here, quite simply, the police officers' suspicion that there *might* have been an injured person inside the house who *might* be in need of aid was nothing more than a hunch or

---

whether they had heard any screams or moans. Officer Womack's report indicated that the neighbors stated that the location had been shot up on the previous night. Officer Womack did not testify at the suppression hearing, however, and the district court concluded that there was no indication in Womack's report as to when he learned that the shots had been fired the night before. The district court therefore credited officer Dotson's testimony that he did not know at the time he entered the Lonyo Street residence when the shooting had occurred.

        I agree with the majority that the question of whether the officers knew the shots had been fired the night before is not pertinent to the exigent-circumstances analysis. Moreover, this court is required to view the facts in the light most favorable to the government. It is nonetheless apparent to me that the government manipulated the evidence for the purpose of making it appear that the officers were not aware of when the shots had been fired.

[2]Opinions from outside this circuit are generally consistent. *Cf. United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002) (warrantless entry justified where police were responding to two 911 dispatches of continued gunshots and arguing from a mobile home and, upon arrival, police encountered the occupant and his wife on the porch; another man emerged from a horse trailer in the yard and a child later appeared in the doorway of the residence); *Tamez v. City of San Marcos*, 118 F.3d 1085 (5th Cir. 1997) (noting that, in the Fifth Circuit, the presence of an armed suspect who poses an immediate threat to citizens can justify a warrantless search, and thus that the warrantless entry at issue was justified where police were responding to a night-time call of shots fired from within a residence, where they observed an individual who was the target of a separate criminal investigation exit the house and the officers knew that the man did not own the house, and the officers heard noise inside the house but could not determine whether anyone was inside without breaking the threshold of the doorway); *United States. v. Arcobasso*, 882 F.2d 1304 (8th Cir. 1989) (warrantless entry and search for possibly injured persons justified where police responded to a call of shots fired within a residence and observed through an open window the occupant dry-firing a gun; the occupant stated to police that there was another person in the house).

unsubstantiated suspicion of the type this court has previously held is not sufficient to create an exigency.  Because the officers' entry in this case was not based upon any objectively reasonable basis for believing that someone was inside the house and in need of medical assistance, I would reverse the district court's denial of the motion to suppress and remand for further proceedings.