# IN THE SUPREME COURT OF IOWA

No. 21–0877

Submitted December 14, 2022—Filed April 7, 2023

**STATE OF IOWA,**

    Appellee,

vs.

**SAM DANIEL ABU YOUM,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson (Motion to suppress) and Lawrence P. McLellan (Trial), Judges.

A defendant is challenging warrantless entry into his apartment and seeks further review of court of appeals decision affirming his drug convictions.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., Mansfield, and May, JJ., joined. McDermott, J., filed a dissenting opinion, in which McDonald and Oxley, JJ., joined.

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye and Robert P. Ranschau (until withdrawal), Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

In this appeal, as well as *State v. Torres*, ___ N.W.2d ___ (Iowa 2023), also filed today, we harmonize *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021), with cases allowing police to enter private residences without a warrant to render emergency assistance. In *Caniglia*, the United States Supreme Court held that the community caretaking exception[1] to the warrant requirement did not allow police performing a welfare check to search a home and seize firearms *after* a suicidal man left by ambulance. *Id.* at 1598, 1600. The *Caniglia* Court, however, indicated that warrantless entries may be allowed in certain emergencies. *See id.* at 1599. We must decide whether this is such a case.

Des Moines police officers responded to reports of shots fired from a specific apartment balcony and a man seen lying on that balcony. Police noticed a car window shot out nearby. Stating they needed to check for injured victims, officers entered the apartment over the objections of the occupants. Officers found a spent shell casing on the balcony and a rifle in plain view in a closet. They then obtained a search warrant and found drugs and another weapon, resulting in criminal charges. The defendant moved to suppress the evidence on the grounds that the initial warrantless entry was unconstitutional. The district court ruled the search was lawful under the emergency aid doctrine. *See State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018) (enumerating the emergency aid

---

[1]Our cases use both "community caretaker" and "community caretaking." *Compare State v. Coffman*, 914 N.W.2d 240, 245 (Iowa 2018) ("community caretaker activity"), *with id.* ("community caretaking doctrine"). Both phrases refer to the same exception to the warrant requirement.

doctrine as one branch of the community caretaking exception). The court of appeals affirmed, and we granted the defendant's application for further review.

On our de novo review, we hold the emergency aid doctrine justified the warrantless entry and search of the apartment to look for a shooting victim, and once inside, the discovery of the shell casing and rifle in plain view in turn supported the issuance of the search warrant and discovery of the additional evidence. In our view, *Caniglia* left the door open for warrantless searches under these exigent circumstances. We therefore affirm the convictions.

**I. Background Facts & Proceedings.**

Just after midnight on August 11, 2020, Des Moines police received calls reporting shots fired at an apartment complex. Sergeant Theodore Stroope arrived at the scene, where a witness pointed him to a specific second-floor apartment as the source of the gunfire and reported seeing a man lying on its balcony after the shooting, "kind of hunched, barely up on the railing." The same witness reported overhearing someone say "they were . . . just testing it out" and "it didn't need to go that far." Officer Zachary Vander Ploeg arrived with his emergency lights activated, and as both officers approached the building, they noticed a car in the parking lot with a broken window and glass on the ground, consistent with recent gunshot damage. The officers spoke with a man, Sam Daniel Abu Youm, who was standing on the balcony and denied hearing any gunshots. Seeing the emergency lights, he asked the police why they were there.

The officers, after spending several minutes outside, walked into the building, climbed the stairs, and knocked on the apartment door in the common

hallway. Another man, Joseph Odir, answered, opened the door just enough to step out, and quickly closed the door behind him. He objected to their entry without a search warrant. He appeared nervous about officers seeing something inside. Sergeant Stroope informed him that they had received reports of shots fired from that apartment and a man seen lying on the balcony and that they needed to go in to make sure no one was hurt. The officers entered over Odir's objections. Abu Youm was inside with three other men apart from Odir. Abu Youm told Sergeant Stroope that he shared the apartment with his brother. They protested the officers' entry without a warrant and repeatedly demanded that they leave.

Officers spent less than one minute searching the apartment for injured occupants. Sergeant Stroope found a spent .45 ACP nickel-plated shell casing on the balcony. Outnumbered five to two and with a firearm unaccounted for, officers decided to handcuff the men to control the scene and protect everyone and called for backup. Abu Youm and another man locked themselves in a bedroom until a third officer arrived and coaxed them out. Sergeant Stroope explained to the men that police had received reports of shots fired and of someone lying down on their balcony. He told the men that the "public safety exception" allowed officers to enter to make sure no one had been shot. Sergeant Stroope read the men their *Miranda* rights, and none answered questions. Officers found a rifle in plain view on the floor of a bedroom closet. Sergeant Stroope observed that the rifle was "chambered in .45 ACP," matching the casing

found on the balcony. Officers found three more .45 ACP casings on the ground immediately below the balcony.

Officers moved the men to squad cars. As they did so, Abu Youm shouted for the others to get his money out of a box in his closet. Once in the squad car, Abu Youm changed his story. He denied that he lived in the apartment and denied that he had been standing on the balcony when officers arrived.

The officers obtained and executed a search warrant. On the shelf inside the closet with the rifle, police found three shoeboxes stacked on top of each other. The first contained two loaded pistol magazines, ten eutylone pills, and medical records bearing Abu Youm's name. The second contained 228 eutylone pills and fifty-two fentanyl pills. The third contained $752 in loose bills and Abu Youm's state-issued ID card. Another box contained a loaded .32 caliber pistol. Officers found three more .45 ACP casings in the kitchen garbage can. A digital scale was found in a closet off the living room.

Abu Youm was charged with two counts of possession of a controlled substance with intent to deliver, with a weapons enhancement, a class "C" felony, and two counts of failure to possess a tax stamp, a class "D" felony. *See* Iowa Code §§ 124.401(1)(*c*)(8), .401(1)(*c*)(9), .401(1)(*e*) (2020); *id.* §§ 453B.3, .12. He pleaded not guilty and filed a motion to suppress the evidence of the drugs and weapons. Abu Youm argued that the warrantless entry was unlawful under the Fourth Amendment and article I, section 8 of the Iowa Constitution and that any evidence recovered through the search warrant must be excluded as fruit of

the poisonous tree. The State resisted, relying on the emergency aid doctrine of the community caretaking exception to the warrant requirement.

At the suppression hearing, the officers' bodycam recordings were admitted into evidence. Sergeant Stroope and Officer Vander Ploeg testified consistent with the bodycam recordings. Sergeant Stroope described his interactions with Odir and explained his decision to enter the apartment:

[Prosecutor:] When you got to Apartment 20, what happened?

[Sergeant Stroope:] I knocked on the door, and I was met by Mr. Odir -- or Mr. Odir answered the door, I should say.

[Prosecutor:] And how did that come about? What did he do?

[Sergeant Stroope:] When he came to the door, he immediately -- like, he only opened the door wide enough to let himself out, and closed the door behind him as he came through. Like, pulled it shut behind himself, which told me that he was very concerned about me seeing something in the apartment, or that he was -- his body language gave the appearance that he was nervous about something in the apartment.

[Prosecutor:] Did you talk to Mr. Odir?

[Sergeant Stroope:] Yes.

[Prosecutor:] And what did you ask him?

[Sergeant Stroope:] I told him that there had been reports of gunshots and asked if I could look inside to verify that no one had been hurt.

[Prosecutor:] And what did he --

[Sergeant Stroope:] He objected to that, and tried to completely pull the door closed behind himself.

[Prosecutor:] So then what happened?

[Sergeant Stroope:] I told him that I had to check the apartment for the safety of everyone inside, as there had been a report of gunshots from that apartment, and the reporting party had

told me that he saw someone lying on the balcony after the shots were fired.

The district court denied the motion to suppress, concluding that the community caretaking exception justified the officers' entry and search of the apartment. The case proceeded to trial, where a jury found Abu Youm guilty on all counts. Abu Youm filed a motion in arrest of judgment and for a new trial based on the weight of the evidence on constructive possession, which the district court overruled. The district court sentenced Abu Youm to a total term of incarceration not to exceed twenty-five years.

Abu Youm appealed, arguing that the district court erred in denying his motion to suppress and his motion for a new trial. We transferred the case to the court of appeals, which affirmed his convictions. The court of appeals acknowledged *Caniglia* narrowed the community caretaking exception but still allowed police to "enter private property without a warrant when certain exigent circumstances exist, including the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." The court of appeals determined that "[a]s the potential need for emergency aid was present before officers arrived at the apartment door, it was reasonable for the officers to cross the threshold and complete an initial search without a warrant." The court of appeals also determined the district court correctly denied Abu Youm's posttrial motions because the jury finding that he was in constructive possession of the drugs and weapons was not contrary to the weight of the evidence.

Abu Youm filed an application for further review, which we granted.

**II. Standard of Review.**

We exercise our discretion to limit our review to the issue of Abu Youm's motion to suppress. The court of appeals decision shall stand as the final opinion in this appeal on the district court's denial of Abu Youm's posttrial motion on the weight of the evidence. *See State v. Montgomery*, 966 N.W.2d 641, 649 (Iowa 2021).

We review the denial of a motion to suppress on constitutional grounds de novo. *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019). We examine the whole record and make our own evaluation of the totality of the circumstances. *Id.* "In doing so, we give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but are not bound by such findings." *State v. Fleming*, 790 N.W.2d 560, 563 (Iowa 2010) (quoting *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007)). "In seeking to sustain an exception to the warrant requirement, the state bears the burden of proof." *State v. Wilson*, 968 N.W.2d 903, 909 (Iowa 2022).

**III. Analysis.**

We must decide whether the district court erred by denying Abu Youm's motion to suppress. Abu Youm contended the initial warrantless entry by police into his residence violated the Fourth Amendment and article I, section 8 of the Iowa Constitution. Both provisions safeguard "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV.[2] Of these, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). That right is not absolute; searches and seizures under a valid warrant are one exception. *Caniglia*, 141 S. Ct. at 1599. And police may also enter a home without a warrant under certain exigent circumstances. *See id.*

Another exception to the warrant requirement is community caretaking. *Coffman*, 914 N.W.2d at 244. The district court relied on *State v. Coffman* to deny Abu Youm's motion to suppress. *See id.* at 244–45. In *Coffman*, we described the emergency aid doctrine as one branch of the community caretaking exception. *Id.* at 244. "Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring." *Id.* (quoting *State v. Tyler*, 867 N.W.2d 136, 170 (Iowa 2015)).[3] "The community caretaking exception to the warrant requirement . . . is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "This exception 'involves the duty of police officers to help citizens an officer reasonably believes may be in need of assistance.' " *Id.* (quoting *Tyler*, 867 N.W.2d at 170).

Applying the community caretaking exception involves three steps:

(1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community

---

[2]The corresponding text of the Iowa Constitution is identical, save for the omission of the Oxford comma. *See* Iowa Const. art. I, § 8.

[3]The other branches are "(2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception." *Id.* (quoting *Tyler*, 867 N.W.2d at 170).

caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Id.* at 245 (quoting *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003)). While the Supreme Court first recognized the community caretaking exception in *Cady v. Dombrowski*, which involved the search of an impounded vehicle for a firearm, *see* 413 U.S. at 437, the community caretaking exception is also applicable to warrantless entries and searches of the home. *See State v. Carlson*, 548 N.W.2d 138, 139, 143 (Iowa 1996) (justifying a forced, warrantless entry into a home to search for a missing person who had been a victim of domestic abuse). Under article I, section 8, the State must "prove *both* that the objective facts satisfy the standards for community caretaking *and* that the officer subjectively intended to engage in community caretaking." *Coffman*, 914 N.W.2d at 257.

As our court of appeals observed in this case, the Supreme Court "recently clarified—and reined in the use of—the community caretaker exception." In *Caniglia*, the Supreme Court determined that a warrantless search and seizure of two handguns located inside a temporarily unoccupied home did not fall within the community caretaker exception after the suicidal occupant had left by ambulance. 141 S. Ct. at 1598–99. The *Caniglia* Court noted the exception recognized in *Cady* was justified because "the 'frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways' often requires police to perform noncriminal 'community caretaking functions,' such as providing aid to motorists." *Id.* at 1599–1600 (alterations and omissions in original) (quoting *Cady*, 413 U.S. at 441). The *Caniglia* Court pointedly observed, "What is reasonable for vehicles is different from what is reasonable

for homes." *Id.* at 1600. The Court emphasized that it "has repeatedly 'declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home.'" *Id.* (omission in original) (quoting *Collins v. Virginia,* 138 S. Ct. 1663, 1672 (2018)). The Court expressly noted that the decision below had not relied on a finding of exigency. *Id.* at 1599 (noting the exigency issue had been forfeited). The exigency ended when the suicidal occupant left by ambulance before the search for his weapons began. *See id.* at 1598.

Importantly, however, the *Caniglia* Court reiterated "that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* at 1599 (quoting *Kentucky v. King,* 563 U.S. 452, 460 (2011)). Three separate concurrences emphasized that point. *See id.* at 1600 (Roberts, C.J., concurring) ("A warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.' Nothing in today's opinion is to the contrary, and I join it on that basis." (citation omitted) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006))); *id.* at 1601 (Alito, J., concurring) (suggesting exigent circumstances allow "warrantless, nonconsensual searches of a home for the purpose of ascertaining whether a resident is in urgent need of medical attention and cannot summon help"); *id.* at 1603–04 (Kavanaugh, J., concurring) ("[O]ne such recognized 'exigency' is the 'need to assist persons who are seriously injured or threatened with such injury.'

The Fourth Amendment allows officers to enter a home if they have 'an objectively reasonable basis for believing' that such help is needed, and if the officers' actions inside the home are reasonable under the circumstances." (citation omitted) (quoting *Brigham City*, 547 U.S. at 403, 406)).

We conclude that *Caniglia* does not foreclose use of the emergency aid doctrine under the community caretaking exception to the warrant requirement under the Fourth Amendment. The Connecticut Supreme Court reached the same conclusion. *See State v. Samuolis*, 278 A.3d 1027, 1037 (Conn. 2022) ("Although the defendant asserts in his brief to this court that it is unclear, in the wake of *Caniglia*, whether warrantless entry is still permitted to assist someone who is injured or facing imminent injury, we find no such ambiguity in that decision. Other courts have continued to apply the emergency exception post-*Caniglia* . . . and the defendant has identified no case in which a court deemed the emergency exception no longer valid." (collecting cases)).

We must decide whether the emergency aid doctrine applies under the facts of this case. We conclude that it does. What was missing in *Caniglia*—exigency—is present here. The officers were responding to reports of gunshots and a body lying prone on a balcony. Officer Vander Ploeg activated the emergency lights at the scene before approaching Abu Youm's apartment. The police saw evidence of recent gunfire—the car window shot out in the parking lot, with broken glass on the pavement. The behavior of the occupants was suspicious. Abu Youm lied to police by denying there had been gunshots. He and Odir were agitated and strenuously objected to their entry into the apartment.

Odir tried to block the officers' view into the apartment when he answered their knock. Sergeant Stroope said at the scene that they needed to enter to see if anyone was hurt inside and needed help. He so testified at the suppression hearing. We credit his testimony as to his reasons for entering the apartment, and we give weight to the trial court's factual findings and implicit credibility determination that the emergency aid doctrine applied. On our de novo review, we determine the State has satisfied the objective and subjective requirements for application of the emergency aid doctrine. *See Coffman*, 914 N.W.2d at 257.

Performing our three-step analysis, we note (1) Abu Youm was seized; (2) police were performing a valid community caretaking function—entering the apartment to render emergency aid to the gunshot victim seen lying prone on the balcony; and (3) the public need for lifesaving aid (and preventing more gunfire) outweighed the intrusion of the privacy rights of the occupants. *See id.* at 245.

Abu Youm argues any claim of emergency is belied by the officer's lack of haste at the scene, where they spent several minutes talking to a witness before walking (not running) into the apartment building. The dissent likewise emphasizes the officers' lack of urgency. Would the dissent prefer that the officers upon arrival immediately sprint upstairs and force their way into the apartment? New York's highest court squarely declined to limit the emergency exception to that scenario:

> [W]e are not impressed by defendant's suggestion, implicit in his argument, that the entry could be constitutional under the emergency exception only if the police broke in immediately. Defining an emergency with the rigidity defendant proposes may

> encourage police—so as to give their actions the appearance of an emergency—to break in prematurely, before exhausting other reasonable means of gaining access. It would be an ironic result were we to "punish" the constabulary by suppressing the evidence merely because they took the time to exercise judgment and circumspection before resorting to force. The appropriately measured response of the police should not be declared illegal merely because they thoughtfully delayed entry for a relatively brief time.

*People v. Molnar*, 774 N.E.2d 738, 742 (N.Y. 2002).

In our view, the officers' caution was understandable. They were about to deal with an unknown number of armed men inside the apartment. And their caution was justified; outnumbered five-to-two inside the apartment, they called for backup after finding the first shell casing on the balcony and soon found the rifle in plain view. If a gunshot victim had bled out inside, the police would have been faulted for not going in. *See Samuolis*, 278 A.3d at 1043 ("It defies common sense to conclude that, if there is any plausible, nonemergency explanation for the facts presented, no entry can be made until there is definitive proof that a person is present who is in need of emergency aid. . . . '[T]he question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency.'" (quoting 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.6(a), at 629–31 (6th ed. 2020))).

Precedent allows police to enter a home without a warrant under such exigent circumstances. *See Brigham City*, 547 U.S. at 406 (justifying a warrantless entry into a home to render aid to a seriously hurt occupant and to

prevent further harm). The Supreme Court maintained this rule in *Caniglia*,[4] and it is one that we have recognized in our cases, *see Wilson*, 968 N.W.2d at 913; *State v. Watts*, 801 N.W.2d 845, 850–51 (Iowa 2011). Exigent circumstances will justify warrantless entries by law enforcement when there is a "compelling need for official action and no time to secure a warrant." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Riley v. California*, 573 U.S. 373, 402 (2014)). One such exigency is the "need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403; *accord Watts*, 801 N.W.2d at 851 (stating that exigent circumstances include, among others, "danger of violence and injury to the officers or others" (quoting *State v. Jackson*, 210 N.W.2d 537, 540 (Iowa 1973))). Under the Fourth Amendment, officers may enter a home if they can articulate "an objectively reasonable basis for believing" that such assistance is needed and if the officers act reasonably inside the home under the circumstances. *Brigham City*, 547 U.S. at 406; *see Watts*, 801 N.W.2d at 850; *State v. Lovig*, 675 N.W.2d 557, 565 (Iowa 2004).

A case originating in Iowa illustrates how the emergency aid doctrine retains vitality after *Caniglia*. In *United States v. Sanders*, Dubuque police responded to a reported domestic disturbance at a home. 4 F.4th 672, 675 (8th Cir. 2021). Police were told young children were inside, and a child could be seen

---

[4]The Court acknowledged the exigent circumstances doctrine but did not discuss its applicability to the facts in *Caniglia* because the respondent police had not claimed reliance on it. *See Caniglia*, 141 S. Ct. at 1599. But as the three concurring opinions noted, the Court's opinion did nothing to change the contours of the exigent circumstances doctrine. *See id.*; *id.* at 1600 (Roberts, C.J., concurring); *id.* at 1601–02 (Alito, J., concurring); *id.* at 1602–03 (Kavanaugh, J., concurring).

in a window "acting excited" and gesturing. *Id.* The woman who answered the door "was visibly upset and unstable" and also had red marks on her face and neck. *Id.* She refused to give the police permission to enter and said "everything was okay." *Id.* She offered to have Sanders come outside. *Id.* Police heard crying inside and decided to enter "to make sure that everyone was safe." *Id.* Inside, matters escalated, and police found a handgun in the couch cushions. *Id.* at 676. Sanders was arrested on a federal charge of possession of a firearm by a prohibited person. *Id.* He filed a motion to suppress challenging the warrantless entry into his home. *Id.* at 675–76. The court denied that motion. *Id.* at 675. He conditionally pleaded guilty, reserving his right to appeal the denial of his suppression motion. *Id.* at 676. The United States Court of Appeals for the Eighth Circuit affirmed his conviction, and the Supreme Court granted Sanders's petition for certiorari, vacated his conviction, and remanded the case for further consideration in light of *Caniglia. Sanders v. United States*, 141 S. Ct. 1646, 1646 (2021) (mem.). On remand, the Eighth Circuit reaffirmed Sanders's conviction. *Sanders*, 4 F.4th at 675. The court determined that "the officers reasonably believed that [warrantless] entry was necessary to either provide emergency assistance to the child who was heard crying or to prevent an imminent assault." *Id.* at 678. We find the officers' entry into Abu Youm's apartment justified for similar reasons.

The State relies on *United States v. Huffman*, 461 F.3d 777 (6th Cir. 2006). In *Huffman*, the United States Court of Appeals for the Sixth Circuit concluded

that exigent circumstances justified a warrantless entry into a home based on the following facts:

> Not only did the 911 call report shots fired at 5742 Lonyo, a residential address, but the officers' additional, albeit brief, conversation with neighbors confirmed that shots were indeed fired at the residence. The officers also observed bullet holes in the exterior and interior walls of the house—a house that looked as if occupants presently resided there. The unswept shards of glass on the front porch of the residence, along with the officers' belief that the shots had been recently fired, suggested that the risk of danger was still imminent.

*Id.* at 785. We might summarize the key facts like this: a report of shots fired at a specific residence was corroborated by physical evidence of a recent shooting.

As in *Huffman,* the facts available to the officers at the time they made their entry into Abu Youm's apartment established exigent circumstances. A witness specifically identified Abu Youm's apartment as the source of gunshots. Just outside the apartment, police observed a car window broken consistent with gunshot damage. The shards of window glass remained unswept on the ground. The witness reports, corroborated by the physical evidence, indicated that someone had discharged a firearm recently and did so either indiscriminately or maliciously in a densely-populated area.

That much alone is a good parallel to *Huffman,* where exigent circumstances were found. *See id.* Yet even more compelling is the eyewitness report of a man laying down on the balcony after the shots were fired. Mr. Odir's nervous demeanor upon answering the door and efforts to block the officers' view into the apartment further justify the warrantless entry. The officers were not required to see an injured victim with their own eyes before entering. *See State v.*

*Ware*, 968 N.W.2d 752, 761 (Wis. Ct. App. 2021) ("Contrary to Ware's argument, the emergency aid exception does not require that officers personally observe indications of an ongoing medical emergency."). In our view, the police acted reasonably in entering the apartment to render aid to a potentially wounded individual, or at the very least to verify that no one had been shot.

The police also acted reasonably inside the apartment. *See Caniglia*, 141 S. Ct. at 1604 (Kavanaugh, J., concurring); *Brigham City*, 547 U.S. at 406. The circumstances suggested a possible gunshot victim. A reasonable search for such a victim would be no more invasive than a "cursory" sweep of the areas that could accommodate a body. *Watts*, 801 N.W.2d at 851 (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). Accordingly, Sergeant Stroope's search of Abu Youm's apartment was brief—less than one minute—and did not pry into boxes, drawers, or cabinets. Sergeant Stroope searched only the areas where an injured person might reasonably be found, such as hallways, bedrooms, closets, the shower tub, and the balcony—the very place where police were told a man was laying down after several gunshots. The scope of Sergeant Stroope's search was reasonable in light of the reason he had to enter the apartment in the first place.

Then, the discovery of the spent casing in plain view on the balcony brought a sea change in the investigation: officers had confirmation of the illegal gunfire. Thus, the officers were justified in detaining the men and conducting a plain-view search for the gun that fired the round. *See State v. Holland*, 389 N.W.2d 375, 380–81 (Iowa 1986) (en banc). On the strength of that evidence, officers applied for and received a warrant for a full search of Abu Youm's

apartment. The search under that warrant is what revealed the drugs and cash in boxes in Abu Youm's closet. Because Abu Youm does not challenge the validity of the warrant, our analysis ends here.

**IV. Disposition.**

For the foregoing reasons, we affirm the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., and Mansfield and May, JJ., join this opinion. McDermott, J., files a dissenting opinion in which McDonald and Oxley, JJ., join.

**McDERMOTT, Justice (dissenting).**

As the name might suggest, the "emergency aid" exception should apply only in cases of *true emergency.* Anything less invites government agents to end-run constitutional search-and-seizure protections based on a "caretaking" pretext when the purpose is really criminal investigation. For this reason, we have applied both an *objective* and a *subjective* requirement for the State to prove that the emergency-aid exception applies: objective, in that the State must establish that the facts available at the moment of the search or seizure would have warranted a reasonable person to believe an emergency existed, and subjective, in that the State must separately prove "that the officer subjectively intended to engage in community caretaking." *State v. Coffman,* 914 N.W.2d 240, 257 (Iowa 2018).

"It is a 'basic principle of Fourth Amendment law,'" the United States Supreme Court has declared, "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477, (1971)). Exceptions to this basic principle, which we reiterated just last term, are jealously drawn and narrowly circumscribed. *State v. Wilson*, 968 N.W.2d 903, 913 (Iowa 2022). The majority finds such an exception applied here and thus permitted the police officers' entry into the home—without permission and without a warrant—to render emergency aid to a possible shooting victim hidden inside.

The majority's holding requires, in my view, a contortive magnification of some facts and minimization of others to get the emergency aid exception to fit. But the glass slipper simply won't oblige. The facts, given their full measure, can't support a permissible entry and search of the home under the emergency aid exception. I thus respectfully dissent.

**I. The Events Giving Rise to the Search of Abu Youm's Home.**

We have an unfiltered view into the facts because the two police officers who responded to the shots-fired report and later entered the home without consent were wearing body cameras. Because we have the advantage of video footage in this case, we "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Video starts as the first arriving officer pulls into the parking lot of a large apartment complex with several buildings. As the officer gets out of his car, two men approach. One of the men, named Robert Devine, takes a pellet gun from his waistband and sets it on the hood of the police cruiser, saying, "Just letting you know I've got [this]."

Devine starts describing a third-story apartment in a nearby building as the source of the shots. He reports hearing someone on the apartment's porch (referring to a balcony that protrudes from the apartment) "talking about 'just getting it tonight, dude didn't need to go that far, just testing it out, dude didn't need to go that far.'" He adds, "So I don't know what happened." Referring to men right then standing on the balcony that Devine had pointed out, the officer asks him: "So those dudes that are out on the porch?" Devine answers, "Yes, dude was laying down on the porch, so I don't know what exactly happened.

Soon as I heard, I got my shorts on and got that [pellet gun] in my back pocket and came out here."

The majority points to this statement by Devine as key information—indeed, perhaps *the* key information—that justified the officers' later warrantless entry to provide emergency aid to a possible shooting victim. I'm unconvinced. The officer doesn't ask Devine any follow-up questions; there's no attempt whatsoever to gather information about the person said to have been laying down. No questions such as, "Do you mean *that* dude now standing there was laying down, or someone else?" No follow-up questions along the lines of: "Was the person shot? Was he bleeding? Did he scream or say anything? Did you see where he went?" Nothing.

The officer likewise, upon hearing Devine's statements, takes no action to suggest he believed a medical emergency was in the offing. He doesn't call for an ambulance or put dispatch on notice that emergency medical aid might be necessary. There's no call on the police radio to say, for instance: "Possible shooting victim," "Get EMTs over here," or even "Put EMTs on notice that we might need assistance."

At this point, the second officer arrives. As he walks up, the first officer says to him, "Those fellows out on the porch right there are supposedly the ones that fired a gun." The first officer makes no mention of anyone lying on the balcony; indeed, at no point before entering the apartment does the first officer ever inform the second officer of this fact. Nor, for that matter, does he offer any suggestion that he believes there might be a shooting victim inside.

Instead, the officers stand there for almost two minutes, in no apparent hurry and acting under no discernible urgency, while the first officer asks Devine a series of perfunctory questions. "Do you got any ID on you?" Devine says it's in the house. The officer then tells Devine to take back his pellet gun from the car's hood and offers a rhetorical question to Devine. "I guess I got to ask, what would that have done for you? Besides get you shot?" Devine sheepishly acknowledges the officer's point and, now giggling, says, "Not much."

The officer then takes out a notepad and asks Devine a series of questions to gather contact information: "What's your last name buddy?" "First name?" "Middle?" He then asks how to spell the middle name and continues: "How old are you?" "Date of birth?" "Where do you live?" "Phone number?" The officer writes down Devine's responses on the notepad as he goes, and then says to Devine, "All right. We'll get back with you."

It's difficult to square the officers' later-asserted belief that someone was bleeding out from a gunshot wound nearby with the officers' squandering of supposedly precious moments standing in the parking lot gathering routine contact information from Devine (and chiding him about bringing his pellet gun). These are not, common sense tells us, the actions of officers who have concluded that a literal life-and-death emergency exists. The officers' response to Devine's account of events is unhurried, almost bureaucratic. The officers, by all appearance, seem focused not on determining whether a shooting victim needs

immediate medical aid but on getting witness contact information for an investigation into a potential unlawful-discharge-of-a-firearm charge.[5]

After taking down the various components of Devine's contact information, the officers walk over to the apartment building Devine had identified. On the way, they see the broken car window that the majority mentions. A man (as it turns out, our eventual defendant, Abu Youm) is standing on the third-story balcony that Devine had pointed to. He is talking with a woman and child standing on the ground below him at the building's front steps.

The officers start talking to him from the ground below. But they don't ask about any possible injuries to anyone. They don't say, for instance, "We spoke to a witness that said someone was lying down on your balcony after they heard gunshots. Is anyone hurt?" Instead, one of the officers asks, "How's it going buddy?" Abu Youm responds, "Good." The officer then inquires, "Is there something happenin' tonight?" Abu Youm responds, "What's going on?" The officer says in response, "Did somebody shoot a gun off out here?" Abu Youm answers, "No, not over here, not on this side." Abu Youm then asks, referring to where the police parked and spoke to Devine, "What's going on over there?" The officer responds, "Somebody said that some gunshots came from over here." Abu Youm asks, "So why is the cars over there?" The officer responds, "Because that's where we were talking to people. That's where I parked." The officer then says, "I'll come up and talk to you."

---

[5]The Iowa Code makes it a crime to recklessly discharge a firearm. *See* Iowa Code § 724.30 (2020). The Des Moines Municipal Code generally outlaws firing a gun within city limits. Des Moines, Iowa, Code of Ordinances § 70-86(a) (2020).

Both officers then walk past the woman and child that Abu Youm had been conversing with on the front steps and enter the building. As they start up the stairs, an officer asks them, "You guys live up there? You guys know these fellas?" The woman says no. The officers' pace never picks up. If the officers were possessed of an urgency to find out if someone might be bleeding from a gunshot wound and needing immediate lifesaving aid, their actions hid it very well.

After reaching the third floor, one of the officers calls on his intercom radio to provide the apartment number to dispatch. He doesn't add any comment such as, "Possible injured person here," or "We're investigating whether a shooting victim is inside." After knocking, the officers stand looking relaxed. One leans against a hallway door frame with his wrist resting near his shoulder. Neither officer makes any query through the door as they wait; they simply wait and give a second, longer knock. There's no imploring for information, no questions along the lines of, "Anyone hurt in there? We want to make sure no one is injured." They wait patiently, silently, seemingly unhurried.

A short bit thereafter, someone asks through the door, "Who is it?" The officer seems to assume the question came from Abu Youm, as suggested by his answer: "The police. The guys that were just talking to you. I said I was gonna come up and say what's up." When a different man (not Abu Youm) opens the door, he steps into the hallway and closes the door behind him part of the way, saying, "Yes sir?" The officer asks about the man they just spoke to on the balcony, and answers his own question as he simultaneously sees Abu Youm inside before the door is partially pulled closed.

The officer asks the man, "Was there a fight or something?" "No. It was just -- people was just being loud," the man responds. "Did somebody break out a car window?" The man again responds "No." The officer then asks, "Is anybody hurt?" "No, we're all good," that man answers. "Do you mind if I make sure nobody's hurt?" the officer asks. "We're all good," the man says again. The officer then says, "I just want to make sure nobody's hurt." To this, the man offers, "I can have them come outside." The officer then says, "No, we're gonna come look around."

The man who answered the door looked anxious, as the majority noted. But his level of anxiety doesn't seem unnatural considering that two uniformed police officers appeared at his door and started asking him questions. Adding the man's anxious demeanor to the equation still leaves us far short of an objective basis to conclude that a bleeding victim resides on the other side of the door. It's not until after the man has responded to several questions (and the officer has already said they're going to enter) that either officer expresses to anyone that night—including, notably, even to *each other*—the prospect of someone being shot and in need of medical aid.

At this point, the pace of the action picks up. The man says, "You need a warrant to come inside my house." The officer says, "No I don't. No, no -- They said that there was a sound of gunshots and that there was a dude laying down." As he says this, the officer steps around the man, gives the door a push open, and both police officers walk into the apartment. The officer says, "Don't

interfere. Don't interfere with me. We're just looking to make sure nobody's hurt, chill out."

A few men who were watching TV in the living room on the other side of the door immediately and loudly complain about the officers' entry. As one officer stands in the living room, the other officer darts throughout the apartment. In response to the cacophony of protests to his presence, the officer says, "If nobody's lying dead in here, we're cool. We're just making sure nobody's hurt." He quickly walks through the entire apartment with a flashlight in hand, opening every door, entering every bedroom and bathroom, and inspecting every bedroom closet.

## II. Applying the Emergency Aid Exception to This Case.

Just last term, we echoed the United States Supreme Court's view that "[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Wilson*, 968 N.W.2d at 912 (quoting *Payton*, 445 U.S. at 585–86). We have described the constitutional privacy protections for homes in prose so florid that a reader might be forgiven for detecting a floral scent from the page. *See id.* "[T]he home," we've declared, "is a remarkable place," one "of solitude and group activity, love and tears, arguments and forgiveness, grace and selfishness, individual expression and collective decisions," and on and on, *id.*, while warning that "[a]ny physical invasion of the structure of the home, 'by even a fraction of an inch' [i]s too much." *Id.* at 912–13 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (second alteration in original)).

Of course, our impassioned language about the protections afforded homes doesn't exactly answer the question before us. Providing emergency aid to an injured occupant (or to protect an occupant from imminent injury) is a recognized exigency exception to the Fourth Amendment, as the Supreme Court recently reasserted in *Caniglia v. Strom,* 141 S. Ct. 1596, 1599 (2021). But our commitment to preserving longstanding constitutional protections for the home must figure prominently as we evaluate whether the State has proved that an exception applies.

This isn't our first case analyzing a community-caretaking claim where police also had a potential crime-solving aim. In *State v. Smith,* police received a report of a single-car crash into a ditch at 4:30 a.m., but found no sign of the driver or any indications of injury. 919 N.W.2d 1, 2 (Iowa 2018) (per curiam). When a van later slowly passed the scene of the crash, police ran the plate and learned that the van was registered to the same address as the car in the ditch. *Id.* Police then pulled over the van, asserting that they were engaging in a community-caretaking function to ensure the welfare of the driver of the crashed car. *Id.* at 3. When police figured out that a passenger in the van had been driving the crashed car—and was still drunk—the police charged him with operating while intoxicated. *Id.* We determined that the van needed no assistance and that the officers' stop thus served a criminal-investigation purpose, not a community-caretaking one, and suppressed evidence from the stop. *Id.* at 5.

The facts in this case, as I view them, similarly reveal a search with an investigatory, not caretaking, purpose.[6] We have a report of shots fired but no report of any victim. Devine's reference to seeing a "dude laying down," without more information—and the officers didn't bother to *ask* for more information—doesn't allow the inferential leap that someone had been shot. The apparently shot-out window of the car in the parking lot likewise doesn't permit a conclusion that a *person* had been shot. No one reported seeing a shooting victim or hearing shouts of pain or injury or fighting. Police did not follow a trail of blood to the door of the home, see a wounded victim through a window, or hear cries or pleas from outside the door. (And this case certainly finds no analog in community caretaking involving, for example, a welfare check on an elderly person who hasn't appeared publicly or answered the phone or door for an extended period. *See Caniglia*, 141 S. Ct. at 1605 (Kavanaugh, J., concurring).)

In *State v. Coffman*, we applied a three-step inquiry to determine whether police could rely on the community caretaking exception. 914 N.W.2d at 245. The second step—whether the police were engaging in a "*bona fide* community-caretaking activity*"—consists of a two-part test requiring police to prove that they had both an objective basis and a subjective intent to engage in

---

[6]I understand that one could criticize my analysis as clouded by the reality, of course, that there was no shooting victim. But courts confront this problem of hindsight bias all the time—usually going the other direction when defendants challenge police searches that turn up evidence of contraband. *See, e.g.*, *State v. Stevens*, 970 N.W.2d 598, 611 (Iowa 2022) (challenging a vehicle search through which the police discovered drugs). I am mindful of Justice Robert Jackson's admonition that "the search at its commencement must be valid and cannot be saved by what it turns up." *Brinegar v. United States*, 338 U.S. 160, 188 (1949) (Jackson, J., dissenting). Or, in this case, what it didn't turn up.

community caretaking. *Id.* at 245, 247 (emphasis added) (quoting *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003)). We interpreted the Iowa Constitution to depart from federal precedent on this point, noting that while the Fourth Amendment required only an objective test that did not depend on the officer's subjective intentions, "[u]nder article I, section 8, though, we believe it is incumbent on the state to prove *both* that the objective facts satisfy the standards for community caretaking *and* that the officer subjectively intended to engage in community caretaking." *Id.* at 257 (explaining that "the term 'bona fide' generally has both an objective and a subjective component").

The majority opinion mentions this two-part test, but it doesn't meaningfully apply it. Indeed, the majority quotes Justice Kavanaugh's concurring opinion in *Caniglia* for the proposition that police must establish only an objective basis, in conflict with the dual objective and subjective tests we laid out in *Coffman* required under article I, section 8 of the Iowa Constitution. *See id.* The majority's attempt to analogize this case to the shots-fired incident in *United States v. Huffman* is similarly unconvincing since it too was applying federal law using only an objective test. *See* 461 F.3d 777, 782–83 (6th Cir. 2006) ("[W]hether the officers' motivation for entering is to arrest suspects and gather evidence or to assist the injured is irrelevant so long as the circumstances objectively justify the action.").

Proof of an officer's subjective intent provides an important tool for courts to distinguish pretextual investigatory invasions from legitimate caretaking efforts. Courts must be on guard about authorizing police to enter homes in

cases such as this one since "concerns about misuse of force and pretextual actions . . . are at their height" when police serve as the government's caretaking emissaries. Christopher Slobogin, *Police as Community Caretakers:* Caniglia v. Strom, 2021 Cato Sup. Ct. Rev. 191, 212–13 (2021). We must approach emergency-aid-exception claims with a measure of skepticism when police officers are investigating crimes at the same time that they purport to serve caretaking functions.

In this case, even if the State could establish an objective basis to support the entry, the State cannot establish that the officers were operating with a subjective intent to provide emergency aid. Analyzing what the *record evidence* shows of an officer's subjective intent, and not simply the officer's after-the-fact explanation with its predictable gloss, is critical if the inquiry into subjective intent is going to mean anything.

On the issue of subjective intent, I return to this fundamental question: Were the officers' actions consistent with a reasonable belief that someone had been shot and required immediate assistance? Nothing in my review of the record, and nothing the majority has highlighted, convinces me that the question is close.

The first officer (the only one to hear Devine's account at the scene) seemed unworried—indeed, indifferent—at Devine's mention of someone lying on the balcony. If the first officer really thought that fact was important enough to justify a warrantless entry into a home to provide emergency aid, how does one explain why he never relays or mentions such a critical detail to the second

officer? Neither officer asked Devine any questions about injuries. Neither officer alerted dispatch that medical assistance might be needed. Neither officer moved at anything that might resemble a brisk pace as one would expect in a true emergency. Not until mere seconds before the officers' entry, as the first officer tells the man at the door that they're coming in, do we get any indication whatsoever that either officer harbors some notion of a need to provide emergency aid to a possible gunshot victim inside. The facts of this case simply fail to establish a subjective basis to authorize the police to enter the apartment in a quest to provide someone with emergency aid.

On these facts, the State failed to show that an exigency existed to obviate the need for a warrant in this case. Because the officers violated Abu Youm's rights under article I, section 8 of the Iowa Constitution when they entered and searched his home, I would reverse the district court's ruling on Abu Youm's motion to suppress and remand for a new trial.

McDonald and Oxley, JJ., join this dissent.